No. 24-50180

# In the United States Court of Appeals for the Fifth Circuit

NATIONAL INFUSION CENTER ASSOCIATION, on behalf of itself and its members; GLOBAL COLON CANCER ASSOCIATION, on behalf of itself and its members; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, on behalf of itself and its members,

*Plaintiffs-Appellants*,

*v.*

XAVIER BECERRA, Secretary, U.S. Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES,

*Defendants-Appellees*,

On Appeal from the U.S. District Court for the Western District of Texas
No. 1:23-cv-707 (Hon. David Alan Ezra)

## RECORD EXCERPTS

Austin Krist
Tim Cleveland
CLEVELAND KRIST LLC
303 Camp Craft Road, Suite 325
Austin, TX 78746
(512) 689-8698
akrist@clevelandkrist.com

*Counsel for Appellant*
*National Infusion Center Association*

Michael Kolber
MANATT, PHELPS & PHILLIPS LLP
7 Times Square
New York, NY 10036
(212) 790-4568
mkolber@manatt.com

*Counsel for Appellant*
*Global Colon Cancer Association*

John P. Elwood
Jeffrey L. Handwerker
Allon Kedem
William C. Perdue
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.elwood@arnoldporter.com

*Counsel for Appellant*
*Pharmaceutical Research and*
*Manufacturers of America*

(additional counsel listed on signature block)

## TABLE OF CONTENTS

Tab 1. Docket Sheet.................................................................ROA.1-10

Tab 2. Notice of Appeal.......................................................ROA.612-13

Tab 3. Memorandum Order..................................................ROA.614-27

Tab 4. Complaint [Excerpts] ................... ROA.11-19, 30, 32-33, 35-47, 53, 63-66

Tab 5. Declaration of Brian Zweben.................................ROA.557-58

Tab 6. Supplemental Declaration of Brian Nyquist .........................ROA.560-67

Tab 1

APPEAL,SH

# U.S. District Court [LIVE]
## Western District of Texas (Austin)
## CIVIL DOCKET FOR CASE #: 1:23-cv-00707-DAE

National Infusion Center Association et al v. Xavier Becerra, et al
Assigned to: Judge David A. Ezra
Case in other court:  USCA Fifth Circuit, 24-50180
Cause: 28:2201 Declaratory Judgment

Date Filed: 06/21/2023
Date Terminated: 02/12/2024
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**National Infusion Center Association**
*on behalf of itself and its members*

represented by **Ibituroko-Emi Lawson**
Cleveland Krist PLLC
303 Camp Croft Road
Austin, TX 78746
737-931-7691
Email: elawson@clevelandkrist.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**McKenzie Noelle Edwards**
Cleveland Krist PLLC
303 Camp Craft Road, Suite 325
Austin, TX 78746
737-900-9844
Email: medwards@clevelandkrist.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy Cleveland**
Cleveland Krist PLLC
303 Camp Craft Road, Suite 325
Austin, TX 78746
512-689-8698
Email: tcleveland@clevelandkrist.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allissa Aileen Pollard**
Arnold & Porter
700 Louisiana Street
Suite 4000
Houston, TX 77002
713-576-2451
Email: allissa.pollard@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

represented by

24-50180.1

**Global Colon Cancer Association**
*on behalf of itself and its members*

**Megan Thibert-Ind**
Manatt, Phelps & Phillips, LLP
151 North Franklin Street, Suite 2600
Chicago, IL 60606
312-477-4799
Email: mthibert-ind@manatt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Strauss Kolber**
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10036
212-790-4568
Email: mkolber@manatt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allissa Aileen Pollard**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Pharmaceutical Research and
Manufacturers of America**
*on behalf of itself and its members*

represented by **Allon Kedem**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
202-942-6234
Email: allon.kedem@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey L. Handwerker**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. Nw
Washington, DC 2001
(202) 942-6103
Fax: (202) 942-6200
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P. Elwood**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave NW
Washington, DC 20001
202-942-5996
Fax: 202-942-5999
Email: john.elwood@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William C. Perdue**
Arnold & Porter Kaye Scholer LLP

601 Massachusetts Ave. NW
Washington, DC 20001
202-942-5685
Email: william.perdue@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allissa Aileen Pollard**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Xavier Becerra**                                    represented by    **Stephen Michael Pezzi**
*In HIs Official Capacity as Secretary of the*                          U.S. Department of Justice
*U.S. Department of Health and Human*                                   Civil Division, Federal Program Branch
*Services*                                                              1100 L. St., NW
                                                                        Washington, DC 20005
                                                                        202-305-8576
                                                                        Email: stephen.pezzi@usdoj.gov
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Christine L. Coogle**
                                                                        U.S. Department of Justice
                                                                        Federal Programs Branch, Civil Division
                                                                        1100 L St. NW
                                                                        Washington, DC 20005
                                                                        202-880-0282
                                                                        Email: christine.l.coogle@usdoj.gov
                                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of Health and Human**               represented by    **Stephen Michael Pezzi**
**Services**                                                            (See above for address)
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Christine L. Coogle**
                                                                        (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Chiquita Brooks-Lasure**                            represented by    **Stephen Michael Pezzi**
*In Her Official Capacity as Administrator*                             (See above for address)
*of the Centers for Medicare and Medicaid*                             *LEAD ATTORNEY*
*Services*                                                              *ATTORNEY TO BE NOTICED*

                                                                        **Christine L. Coogle**
                                                                        (See above for address)

*ATTORNEY TO BE NOTICED*

**Defendant**

**Centers for Medicare and Medicaid Services**

represented by **Stephen Michael Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Biosimilars Forum**

represented by **Joseph Carl Cecere , II**
Cecere PC
6035 McCommas Blvd
Dallas, TX 75206
469-600-9455
Email: ccecere@cecerepc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Fresenius Kabi USA, LLC**

represented by **Imron T. Aly**
ArentFox Schiff
233 South Wacker
Suite 7100
Chicago, IL 60606
312-258-5500
Email: imron.aly@afslaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/21/2023 | 1 (p.11) | COMPLAINT ( Filing fee $ 402 receipt number ATXWDC-17572501). No Summons requested at this time, filed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. (Attachments: # 1 (p.11) Civil Cover Sheet)(Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 2 (p.72) | REQUEST FOR ISSUANCE OF SUMMONS by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. *as to Xavier Becerra* (Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 3 (p.74) | REQUEST FOR ISSUANCE OF SUMMONS by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. *as to U.S. Department of Health & Human Services* (Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 4 (p.76) | REQUEST FOR ISSUANCE OF SUMMONS by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. *as to Chiquita Brooks-Lasure* (Pollard, Allissa) (Entered: 06/21/2023) |

| | | |
|---|---|---|
| 06/21/2023 | 5 (p.78) | REQUEST FOR ISSUANCE OF SUMMONS by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. *as to Centers for Medicare & Medicaid Services* (Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 6 (p.80) | MOTION to Appear Pro Hac Vice by Allissa Aileen Pollard *for Jeffrey L. Handwerker* ( Filing fee $ 100 receipt number BTXWDC-17576096) by on behalf of Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 (p.11) Proposed Order)(Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 7 (p.85) | MOTION to Appear Pro Hac Vice by Allissa Aileen Pollard *for Allon Kedem* ( Filing fee $ 100 receipt number ATXWDC-17576164) by on behalf of Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 (p.11) Proposed Order)(Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 8 (p.91) | MOTION to Appear Pro Hac Vice by Allissa Aileen Pollard *for John P. Elwood* ( Filing fee $ 100 receipt number ATXWDC-17576212) by on behalf of Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 (p.11) Proposed Order)(Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 9 (p.97) | MOTION to Appear Pro Hac Vice by Allissa Aileen Pollard *for William C. Perdue* ( Filing fee $ 100 receipt number ATXWDC-17576327) by on behalf of Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 (p.11) Proposed Order)(Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 10 (p.103) | MOTION to Appear Pro Hac Vice by Allissa Aileen Pollard *for Michael Kolber* ( Filing fee $ 100 receipt number ATXWDC-17576381) by on behalf of Global Colon Cancer Association. (Attachments: # 1 (p.11) Proposed Order)(Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 11 (p.108) | MOTION to Appear Pro Hac Vice by Allissa Aileen Pollard *for Megan Thibert-Ind* ( Filing fee $ 100 receipt number ATXWDC-17576416) by on behalf of Global Colon Cancer Association. (Attachments: # 1 (p.11) Proposed Order)(Pollard, Allissa) (Entered: 06/21/2023) |
| 06/21/2023 | 12 (p.113) | JS44 (Civil Cover Sheet) submitted by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. (Pollard, Allissa) (Entered: 06/21/2023) |
| 06/22/2023 | 13 (p.115) | RULE 7 DISCLOSURE STATEMENT filed by Pharmaceutical Research and Manufacturers of America. (Pollard, Allissa) (Entered: 06/22/2023) |
| 06/22/2023 | | Case assigned to Judge Docket II - Austin. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (dm) (Entered: 06/22/2023) |
| 06/22/2023 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Hightower. (dm) (Entered: 06/22/2023) |
| 06/22/2023 | 14 (p.118) | Summons Issued as to Centers for Medicare and Medicaid Services, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services, Xavier Becerra, Secretary, United States Department of Health and Human Services. (dm) (Entered: 06/22/2023) |
| 06/23/2023 | 15 | ORDER GRANTING 6 (p.80) Motion to Appear Pro Hac Vice for Attorney Jeffrey |

| | | |
|---|---|---|
| | (p.126) | L. Handwerker for Pharmaceutical Research and Manufacturers of America. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (pg) (Entered: 06/23/2023) |
| 06/23/2023 | 16 (p.127) | ORDER GRANTING 7 (p.85) Motion to Appear Pro Hac Vice for Attorney Allon Kedem for Pharmaceutical Research and Manufacturers of America. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (pg) (Entered: 06/23/2023) |
| 06/23/2023 | 17 (p.128) | ORDER GRANTING 8 (p.91) Motion to Appear Pro Hac Vice for Attorney John P. Elwood for Pharmaceutical Research and Manufacturers of America. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (pg) (Entered: 06/23/2023) |
| 06/23/2023 | 18 (p.129) | ORDER GRANTING 9 (p.97) Motion to Appear Pro Hac Vice for Attorney William C. Perdue for Pharmaceutical Research and Manufacturers of America. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (pg) (Entered: 06/23/2023) |
| 06/23/2023 | 19 (p.130) | ORDER GRANTING 10 (p.103) Motion to Appear Pro Hac Vice for Attorney Michael Kolber for Global Colon Cancer Association. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (pg) (Entered: 06/23/2023) |
| 06/23/2023 | 20 (p.131) | ORDER GRANTING 11 (p.108) Motion to Appear Pro Hac Vice for Attorney Megan Thibert-Ind for Global Colon Cancer Association. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (pg) (Entered: 06/23/2023) |
| 06/27/2023 | 21 (p.132) | RULE 7 DISCLOSURE STATEMENT filed by National Infusion Center Association. (Edwards, McKenzie) (Entered: 06/27/2023) |
| 06/30/2023 | 22 (p.134) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. U.S. Department of Health and Human Services served on 6/29/2023, answer due 8/28/2023. (Pollard, Allissa) (Entered: 06/30/2023) |
| 06/30/2023 | 23 (p.138) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. Xavier Becerra, Secretary, United States Department of Health and Human Services served on 6/29/2023, answer due 8/28/2023. (Pollard, Allissa) (Entered: 06/30/2023) |
| 07/05/2023 | | |

| | 24<br>(p.142) | RULE 7 DISCLOSURE STATEMENT filed by Global Colon Cancer Association. (Kolber, Michael) (Entered: 07/05/2023) |
|---|---|---|
| 07/14/2023 | 25<br>(p.145) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. Xavier Becerra served on 7/5/2023, answer due 9/5/2023. (Pollard, Allissa) (Entered: 07/14/2023) |
| 07/14/2023 | 26<br>(p.148) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. U.S. Department of Health and Human Services served on 7/5/2023, answer due 9/5/2023. (Pollard, Allissa) (Entered: 07/14/2023) |
| 07/14/2023 | 27<br>(p.151) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. Centers for Medicare and Medicaid Services served on 7/11/2023, answer due 9/11/2023. (Pollard, Allissa) (Entered: 07/14/2023) |
| 07/14/2023 | 28<br>(p.154) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. Chiquita Brooks-Lasure served on 7/11/2023, answer due 9/11/2023. (Pollard, Allissa) (Entered: 07/14/2023) |
| 07/14/2023 | 29<br>(p.157) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. Chiquita Brooks-Lasure served on 7/12/2023, answer due 9/11/2023. (Pollard, Allissa) (Entered: 07/14/2023) |
| 07/14/2023 | 30<br>(p.160) | SUMMONS Returned Executed by National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, Global Colon Cancer Association. Centers for Medicare and Medicaid Services served on 7/12/2023, answer due 9/11/2023. (Pollard, Allissa) (Entered: 07/14/2023) |
| 07/19/2023 | 31<br>(p.163) | NOTICE of Attorney Appearance by Stephen Michael Pezzi on behalf of Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services. Attorney Stephen Michael Pezzi added to party Xavier Becerra(pty:dft), Attorney Stephen Michael Pezzi added to party Chiquita Brooks-Lasure(pty:dft), Attorney Stephen Michael Pezzi added to party Centers for Medicare and Medicaid Services(pty:dft), Attorney Stephen Michael Pezzi added to party U.S. Department of Health and Human Services(pty:dft) (Pezzi, Stephen) (Entered: 07/19/2023) |
| 07/21/2023 | 32<br>(p.164) | NOTICE of Attorney Appearance by Christine L. Coogle on behalf of Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services. Attorney Christine L. Coogle added to party Xavier Becerra(pty:dft), Attorney Christine L. Coogle added to party Chiquita Brooks-Lasure(pty:dft), Attorney Christine L. Coogle added to party Centers for Medicare and Medicaid Services(pty:dft), Attorney Christine L. Coogle added to party U.S. Department of Health and Human Services(pty:dft) (Coogle, Christine) (Entered: 07/21/2023) |
| 08/01/2023 | 33<br>(p.165) | Joint MOTION *to Set Briefing Schedule and For Other Relief* by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 (p.11) Proposed Order)(Pollard, Allissa) (Entered: 08/01/2023) |

| | | |
|---|---|---|
| 08/02/2023 | 34 (p.171) | *** **VACATED per** 45 (p.524) **Order** *** ORDER GRANTING 33 (p.165) Motion to set Briefing Schedule. Signed by Judge Robert Pitman. (pg) Modified docket text on 9/12/2023 (pg). (Entered: 08/03/2023) |
| 08/10/2023 | 35 (p.173) | MOTION for Summary Judgment by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 (p.11) Ex. 01 - Expert Declaration of Dr. Craig Garthwaite, # 2 (p.72) Ex. 02 - Declaration of Adam Gluck (Sanofi), # 3 (p.74) Ex. 03 - Declaration of Brian Nyquist (NICA), # 4 (p.76) Ex. 04 - Declaration of Andrew Spiegel (GCCA), # 5 (p.78) Ex. 05 - Declaration of Kristen Bernie (PhRMA), # 6 (p.80) Ex. 06 - Declaration of Patrick Costello (Amgen))(Pollard, Allissa) (Entered: 08/10/2023) |
| 08/24/2023 | 36 (p.366) | Unopposed MOTION for Leave to File Amicus Brief by J. Cark Cecere. by The Biosimilars Forum. (Attachments: # 1 (p.11) Exhibit A - Proposed Brief of the Biosimilars Forum as Amicus Curiae, # 2 (p.72) Proposed Order)(Cecere, Joseph) (Entered: 08/24/2023) |
| 08/25/2023 | | Text Order GRANTING 36 (p.366) Unopposed Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file the attached amicus brief, (Dkt. 36-1). (This is a text-only entry generated by the court. There is no document associated with this entry.) (jllc) (Entered: 08/25/2023) |
| 08/25/2023 | 37 (p.392) | THE BIOSIMILARS FORUM'S BRIEF in support of Plaintiffs' 35 (p.173) MOTION for Summary Judgment. (pg) (Entered: 08/25/2023) |
| 08/28/2023 | 38 (p.411) | MOTION for Leave to File Amicus Brief *IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT* by Imron T. Aly. by Fresenius Kabi USA, LLC. (Attachments: # 1 (p.11) Brief BRIEF OF AMICUS CURIAE FRESENIUS KABI IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT)(Aly, Imron) (Entered: 08/28/2023) |
| 08/28/2023 | 39 (p.434) | MOTION to Dismiss by Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services. (Coogle, Christine) (Entered: 08/28/2023) |
| 08/29/2023 | 40 (p.459) | MOTION to Vacate 34 (p.171) Order on Motion for Miscellaneous Relief by Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services. (Attachments: # 1 (p.11) Proposed Order)(Coogle, Christine) (Entered: 08/29/2023) |
| 08/31/2023 | 41 (p.467) | Response in Opposition to Motion, filed by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, re 40 (p.459) MOTION to Vacate 34 (p.171) Order on Motion for Miscellaneous Relief filed by Defendant Chiquita Brooks-Lasure, Defendant Centers for Medicare and Medicaid Services, Defendant Xavier Becerra, Defendant U.S. Department of Health and Human Services (Attachments: # 1 (p.11) Declaration of Jeffrey Handwerker, # 2 (p.72) Proposed Order)(Pollard, Allissa) (Entered: 08/31/2023) |
| 09/01/2023 | 42 (p.499) | REPLY to Response to Motion, filed by Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services, re 40 (p.459) MOTION to Vacate 34 (p.171) Order on Motion for Miscellaneous Relief filed by Defendant Chiquita Brooks-Lasure, Defendant Centers for Medicare and Medicaid Services, Defendant Xavier Becerra, Defendant U.S. |

| | | |
|---|---|---|
| | | Department of Health and Human Services (Coogle, Christine) (Entered: 09/01/2023) |
| 09/06/2023 | | Text Order GRANTING 38 (p.411) Unopposed Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file the attached amicus brief, (Dkt. 38-1). (This is a text-only entry generated by the court. There is no document associated with this entry.) (jllc) (Entered: 09/06/2023) |
| 09/06/2023 | 43 (p.502) | FRESENIUS KABI'S BRIEF IN SUPPORT OF Plaintiff's 35 (p.173) MOTION for Summary Judgment.(pg) (Entered: 09/06/2023) |
| 09/08/2023 | 44 (p.520) | Opposed MOTION for Extension of Time to File Response/Reply as to 39 (p.434) MOTION to Dismiss by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. (Pollard, Allissa) (Entered: 09/08/2023) |
| 09/08/2023 | | Text Order GRANTING 44 (p.520) Motion for Extension of Time to File Response entered by Judge Robert Pitman. IT IS ORDERED that Plaintiffs shall respond to Defendants' motion to dismiss on or before September 25, 2023. In light of the extension and Defendants' pending motion to vacate, (Dkt. 40), IT IS FURTHER ORDERED that each deadline set forth in the parties' joint scheduling order, (Dkt. 34, at 2), shall be extended by 14 days. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jllc) (Entered: 09/08/2023) |
| 09/11/2023 | 45 (p.524) | ORDER GRANTING 40 (p.459) Motion to Vacate. The scheduling order entered on August 2, 2023, (Dkt. 34), is VACATED. HHS's response and cross-motion for summary judgment shall be due within 14 days of this Court's order on its motion to dismiss, (Dkt. 39). Signed by Judge Robert Pitman. (pg) (Entered: 09/12/2023) |
| 09/21/2023 | 46 (p.528) | ORDER REASSIGNING CASE. Case reassigned to Judge David A. Ezra for all proceedings. Judge Docket II - Austin no longer assigned to case. Signed by Judge Robert Pitman. (bot2) (Entered: 09/21/2023) |
| 09/25/2023 | 47 (p.529) | Response in Opposition to Motion, filed by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America, re 39 (p.434) MOTION to Dismiss filed by Defendant Chiquita Brooks-Lasure, Defendant Centers for Medicare and Medicaid Services, Defendant Xavier Becerra, Defendant U.S. Department of Health and Human Services (Attachments: # 1 (p.11) Exhibit A - Declaration of Brian Zweben, # 2 (p.72) Exhibit B - Supplemental Declaration of Brian Nyquist)(Pollard, Allissa) (Entered: 09/25/2023) |
| 09/26/2023 | 48 (p.568) | MOTION for Extension of Time to File Response/Reply as to 39 (p.434) MOTION to Dismiss by Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services. (Attachments: # 1 (p.11) Proposed Order)(Pezzi, Stephen) (Entered: 09/26/2023) |
| 09/27/2023 | | Text Order GRANTING 48 (p.568) Motion for Extension of Time to File Response/Reply re 48 (p.568) MOTION for Extension of Time to File Response/Reply as to 39 (p.434) MOTION to Dismiss. It is ORDERED that Defendants shall file their reply brief on or before October 13, 2023. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (MGlc) (Entered: 09/27/2023) |
| 10/13/2023 | 49 (p.572) | REPLY to Response to Motion, filed by Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human |

| | | |
|---|---|---|
| | | Services, re 39 (p.434) MOTION to Dismiss filed by Defendant Chiquita Brooks-Lasure, Defendant Centers for Medicare and Medicaid Services, Defendant Xavier Becerra, Defendant U.S. Department of Health and Human Services (Pezzi, Stephen) (Entered: 10/13/2023) |
| 11/02/2023 | 50 (p.588) | NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF 39 (p.434) MOTION TO DISMISS by Xavier Becerra, Chiquita Brooks-Lasure, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services (Pezzi, Stephen) Modified docket text and link entry relationships on 2/2/2024 (pg). (Entered: 11/02/2023) |
| 11/07/2023 | 51 (p.590) | MOTION for Leave to File Response to Defendants' Notice of Supplemental Authority by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 (p.11) Ex. A - Plaintiffs' Response to Defendants' Notice of Supplemental Authority in Support of Motion to Dismiss)(Pollard, Allissa) (Entered: 11/07/2023) |
| 01/30/2024 | | Text Order GRANTING 51 (p.590) Motion for Leave to File. Plaintiffs' Response, as attached to Dkt. # 51, shall be accepted for filing. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (MGlc) (Entered: 01/30/2024) |
| 01/30/2024 | 52 (p.595) | RESPONSE to 50 (p.588) NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF 39 (p.434) MOTION TO DISMISS by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. (pg) (Entered: 02/02/2024) |
| 02/12/2024 | 53 (p.598) | ORDER, the Court dismisses Plaintiff NICA for lack of subject matter jurisdiction under Fed. Rule of Civ. P. 12(b) (1) and dismisses the case for lack of venue under Fed. Rule of Civ. P. 12(b)(3).Defendants' Motion to Dismiss (Dkt. # 39 (p.434) ) is therefore GRANTED, and Plaintiffs' Motion for Summary Judgment (Dkt. # 35 (p.173) ) is MOOTED. This dismissal is WITHOUT PREJUDICE. The case shall be CLOSED. Signed by Judge David A. Ezra. (pg) (Entered: 02/12/2024) |
| 03/06/2024 | 54 (p.612) | Appeal of Order entered by District Judge 53 (p.598) by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. ( Filing fee $ 605 receipt number ATXWDC-18497099) (Attachments: # 1 (p.11) (ECF 53) Order Granting Defendants' Motion to Dismiss)(Pollard, Allissa) (Entered: 03/06/2024) |
| 03/06/2024 | | NOTICE OF APPEAL following 54 (p.612) Notice of Appeal (E-Filed), by Global Colon Cancer Association, National Infusion Center Association, Pharmaceutical Research and Manufacturers of America. Filing fee $ 605, receipt number ATXWDC-18497099. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out a (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (klw) (Entered: 03/07/2024) |

Tab 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

NATIONAL INFUSION CENTER
ASSOCIATION, on behalf of itself and its
members; GLOBAL COLON CANCER
ASSOCIATION, on behalf of itself and its
members; and PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF AMERICA, on
behalf of itself and its members,

           Plaintiffs,

vs.

XAVIER BECERRA, in his official capacity as
Secretary of the U.S. Department of Health and
Human Services, *et al.*,

           Defendants.

Civil Action No. 1:23-cv-00707-DAE

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs, the National Infusion Center Association, the Global

Colon Cancer Association, and the Pharmaceutical Research and Manufacturers of America,

appeal to the United States Court of Appeals for the Fifth Circuit regarding this Court's Order

dated February 12, 2024 (a copy of which is attached hereto), dismissing Plaintiff the National

Infusion Center Association for lack of subject matter jurisdiction under Federal Rule of Civil

Procedure 12(b)(1) and dismissing the case as to all parties for lack of venue under Federal Rule

of Civil Procedure 12(b)(3).

Dated: March 6, 2024

Respectfully submitted,

/s/ Michael Kolber
Michael Kolber* (New York Bar No.
  4806527)
MANATT, PHELPS & PHILLIPS LLP
7 Times Square
New York, NY 10036
(212) 790-4568
mkolber@manatt.com

Megan Thibert-Ind* (Illinois Bar No.
  6290904)
MANATT, PHELPS & PHILLIPS LLP
151 N. Franklin St. Suite 2600
Chicago, IL 60606
(312) 477-4799
mthibert-ind@manatt.com

*Admitted Pro Hac Vice*

Counsel for Plaintiff Global Colon Cancer
Association

/s/ Tim Cleveland
Tim Cleveland (Texas Bar No. 24055318)
Austin Krist (Texas Bar No. 24106170)
Ibituroko-Emi Lawson (Texas Bar No.
  24113443)
McKenzie Edwards (Texas Bar No.
  24116316)
CLEVELAND KRIST LLC
303 Camp Craft Road, Suite 325
Austin, TX 78746
(512) 689-8698
tcleveland@clevelandkrist.com

Counsel for Plaintiff National Infusion Center
Association

/s/ Allissa Pollard
Allissa Pollard (Texas Bar No. 24065915)
ARNOLD & PORTER KAYE SCHOLER
  LLP
700 Louisiana Street, Suite 4000
Houston, TX 77002
(713) 576-2451
allissa.pollard@arnoldporter.com

Jeffrey Handwerker*(D.C. Bar No. 451913)
John Elwood*(D.C. Bar No. 452726)
Allon Kedem* (D.C. Bar No. 1009039)
William Perdue*(DC Bar No. 995365)
ARNOLD & PORTER KAYE SCHOLER
  LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
jeffrey.handwerker@arnoldporter.com

*Admitted Pro Hac Vice*

Counsel for Plaintiff Pharmaceutical Research
and Manufacturers of America

Tab 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL INFUSION CENTER | § | No. 1:23-CV-707 |
| ASSOCIATION et al., | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | |
| | § | |
| XAVIER BECERRA, in his official | § | |
| capacity as Secretary of the | § | |
| Department of Health and | § | |
| Human Services, et al., | § | |
| *Defendants*. | § | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services, the U.S. Department of Health and Human Services, Chiquita Brooks-Lasure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services, and the Centers for Medicare and Medicaid Services' (collectively, "Defendants") Motion to Dismiss (Dkt. # 39).

The Court finds this matter suitable for disposition without a hearing. After careful consideration of the memoranda filed in support of and against the motions, the Court **GRANTS** Defendants' Motion to Dismiss (Dkt. # 39).

1

24-50180.614

<u>BACKGROUND</u>

Medicare is the federal medical insurance program for the aged and disabled. 42 U.S.C. § 1395. A provider's participation in the Medicare program is completely voluntary. <u>See</u> 42 C.F.R. § 489.10. The Secretary ("Secretary") for the Department of Health and Human Services ("HHS") operates Medicare through the Centers for Medicare and Medicaid Services ("CMS"), which in turn hires contractors to perform administrative functions on CMS's behalf. 42 U.S.C. § 1395u.

Medicare offers two prescription drug programs – Medicare Part B and Part D. Medicare Part B covers medically necessary and preventative healthcare services, including prescription drugs. 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(2)(A). Under Part B, CMS will reimburse prescription drug providers, based on the "average sales price" of the drug. <u>See</u> 42 U.S.C. § 1395w-3a. Medicare Part D is a voluntary outpatient drug benefit, provided by privately-operated plans. 42 U.S.C. § 1395w-102.

As part of the Inflation Reduction Act of 2022 ("IRA" or "the Act"), Congress directed HHS to establish a "Drug Price Negotiation Program." 42 U.S.C. § 1320f(a). Through this program, the HHS ranks and selects "negotiation-eligible drugs" and then negotiates with the manufacturers to determine a "maximum fair price." 42 U.S.C. § 1320f–2(a)(1); 1320f–1(b)(1)(A). Once a

2

maximum fair price is set, manufacturers must provide the drugs at that price to individuals, pharmacies, providers, and other entities participating in Medicare.  42 U.S.C. § 1320f–2(a)(1).  Manufacturers that fail to do so may pay a per-unit penalty of ten times the difference between the price charged and the maximum fair price, transfer its interest in the drug to another entity, or withdraw from Medicate and Medicaid Programs.  42 U.S.C. § 1320f–6(b); CMS, Medicare Drug Price Negotiation Program: Revised Guidance 129–131 (June 30, 2023), https://perma.cc/K6QB-C3MM ("Revised Guidance"); 26 U.S.C. § 5000D(c)(1).

 HHS will begin implementing the program in 2026.  U.S.C. § 1320f. The IRA does not allow for administrative or judicial review of "selection of drugs," "determination of negotiation-eligible drugs," "determination of qualifying single source drugs," and "determination of a maximum fair price."  Id. § 1320f–7.

 There are three plaintiffs: PhRMA, Global Colon Cancer Association ("GCCA"), and National Infusion Center Association ("NICA").  PhRMA is a non-profit corporation that serves as the "pharmaceutical industry's principal policy advocate." (Dkt. # 1 at 10.)  PhRMA's members include pharmaceutical and biotechnology companies.  (Id.)  GCCA is a non-profit corporation that represents "millions of colon cancer patients worldwide[.]"  (Dkt. # 1 at 9.)  NICA is a non-profit corporation that represents non-hospital, community-based infusion providers.  (Dkt. # 1 at 8.)  NICA is the only plaintiff that resides in this district.

3

24-50180.616

(Id. at 8–10.)  The remaining Plaintiffs, PhRMA and GGCCA, reside outside the state of Texas.

Plaintiffs assert that the IRA Drug Pricing Program is unconstitutional because it (1) violates the nondelegation doctrine (2) the Excessive Fines Clause of the Eight Amendment and (3) the Due Process Clause of the Fifth Amendment. (Dkt. # 1.)  Plaintiffs named four defendants: the United States Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), Xavier Becerra (in his official capacity as Secretary of HHS), and Chiquita Brooks-LaSure (in her official capacity as Administrator of CMS). (Dkt. # 1.)  Plaintiffs ask this court for declare the IRA Drug Pricing Program and excise tax is unconstitutional, enjoin HHS from implementing the IRA Drug Pricing Program, and award Plaintiffs with reasonable attorney's fees and costs under 28 U.S.C. § 2412.  (Dkt. # 1 at 57.)

Plaintiffs filed a Motion for Summary Judgment on August 10, 2023. (Dkt. # 35.)  The Defendants filed a Motion to Dismiss on August 28, 2023.  (Dkt. # 39.)  The case was reassigned to the undersigned on September 21, 2023.  (Dkt. # 46.)  The Plaintiffs filed a Response to the Motion to Dismiss on September 25, 2023.  (Dkt. # 47.)  The Defendants filed a Reply on October 13, 2023.  (Dkt. # 49.)  On November 2, 2023, Defendants filed a Notice of Supplemental Authority.

24-50180.617

(Dkt. # 50.)  On November 7, 2023, Plaintiffs filed a Response to the Notice of Supplemental Authority.  (Dkt. # 52.)

LEGAL STANDARD

A.  <u>Motion to Dismiss under 12(b)(1)</u>

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a federal court's subject matter jurisdiction. <u>See</u> Fed. R. Civ. P. 12(b)(1).  Under Rule 12(b)(1), a claim is properly dismissed for lack of subject matter jurisdiction when a court lacks statutory or constitutional authority to adjudicate the claim.  <u>Home Builders Assoc. of Mississippi, Inc. v. City of Madison</u>, 143 F.3d 1006, 1010 (5th Cir. 1998).

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  <u>Den Norske Stats Oljeselskap As v. HeereMac Vof</u>, 241 F.3d 420, 424 (5th Cir. 2001) (citation omitted).

B.  <u>Motion to Dismiss for Improper Venue</u>

Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss an action for "improper venue." Fed. R. Civ. P. 12(b)(3). Once a defendant raises improper venue by motion, "the burden of sustaining venue will be on [the]

5

Plaintiff." <u>Cincinnati Ins. Co. v. RBP Chem. Tech., Inc.</u>, No. 1:07-CV-699, 2008
WL 686156, at *5 (E.D. Tex. 2008). "Plaintiff may carry this burden by
establishing facts that, if taken to be true, establish proper venue." Id. (citations
omitted).

If venue is improper, the Court must dismiss, "or if it be in the interest
of justice, transfer such case to any district or division in which it could have been
brought." 28 U.S.C. § 1406(a); Fed. R. Civ. P. 12(b)(3).

<u>DISCUSSION</u>

Defendants argue that this Court lacks jurisdiction over Plaintiff NICA
for two reasons. (Dkt. # 39 at 1.) First, Defendants argue that NICA has not
satisfied the jurisdictional prerequisites of the Medicare Act. (Id. at 2.) Second,
Defendants contend that NICA has not identified a member with Article III
standing. (Id. at 1.) For these reasons, Defendants contend that NICA is not a
proper plaintiff. If the Court agrees and dismisses NICA, Defendants ask the Court
to find that venue is improper.

I.    <u>NICA Has Not Satisfied the Jurisdictional Prerequisites under the
      Medicare Act</u>

Congress has divested the courts of federal question jurisdiction over
"any claim arising under" the Medicare Act, unless the claim has been (1)

6

24-50180.619

presented to the agency and (2) administrative remedies have been exhausted.[1]  42

U.S.C. § 405(g) and (h).  Section 1395ii incorporates 405(g) and (h) into the

Medicare Act (or subchapter XVIII, Ch. 7, Title 42).  42 U.S.C. § 1395ff(b)(1)(A).

That said, the Supreme Court has recognized an exception to this jurisdictional bar

when requiring "channeling a claim through the agency would result in the

'*complete* preclusion of judicial review.'"  Fam. Rehabilitation, Inc. v. Azar, 886

F.3d 496, 504–505 (5th Cir. 2018) (quoting Shalala v. Illinois Council on Long

Term Care, Inc., 529 U.S. 23 (2000)).  Therefore, this Court must first analyze

whether NICA's claim "arises under" the Medicare Act.  If it does, the Court must

then decide whether the exception applies here.

### A. NICA's claim "arises under" the Medicare Act

Section 405(h) bars federal-question jurisdiction for claims that "arise

under" the Medicare Act.  42 U.S.C. § 405(g) and (h); 42 U.S.C. § 1395ii.  Ill.

Council, 529 U.S. at 13.  "[V]irtually all legal attacks under the Act [must] be

brought through the agency."  Physician Hosps. of Am. v. Sebelius, 691 F.3d 649,

653 (5th Cir. 2012) (quoting Ill. Council, 529 U.S. at 13.)  A claim arises under the

Medicare Act when "both the standing and the substantive basis for the

---

[1]The exhaustion requirement is waivable, but the requirement that a claim be presented to the
Agency is not waivable. See Smith v. Berryhill, 139 S.Ct. 1765, 1773–74 (2019).

7

presentation of the claims" is the Medicare Act.  Heckler v. Ringer, 466 U.S. 602, 615 (1984) (quoting Weinberger v. Salfi, 422 U.S. 749, 760–61 (1975)).

Plaintiffs contend that the channeling provision in 405(h) does not apply to their claim because the claims are not an "initial determination[s] of benefits" but instead "constitutional challenges" to the IRA.  (Dkt. # 47 at 17.)

The Supreme Court and the Fifth Circuit have held that federal question jurisdiction bars claims that "arise under" the Medicare Act, even when the claim is for reimbursement or is a constitutional challenge.  Ill. Council, 529 U.S. at 13, Physician Hosps., 691 F.3d at 659.  In Ill. Council, the Supreme Court determined that a constitutional challenge to Medicare regulations that affected future reimbursement still "arises under" the Medicare Act.  529 U.S. at 10–13 (finding that the jurisdictional bar applied when plaintiffs "needing advance knowledge for planning purposes, together bring a § 1331 action challenging such a rule or regulation on general legal grounds).  Similarly, in Physician Hosps., a trade group and a hospital sought declaratory and injunctive relief on the basis that a provision of the Patient Protection and Affordable Care Act that limited Medicare reimbursements was unconstitutional.  691 F.3d at 659.  There, the Fifth Circuit also found that the claims arose under the Medicare Act, even though the challenges were constitutional, because the Act still provided "both the standing and substantive basis for the presentation of the constitutional contentions."  Id. at

8

659.  Both Ill. Council and Physician Hosps. teach that even a constitutional

challenge to a statute may "arise under" the Medicare Act.

For these reasons, Plaintiffs' claims arise under the Medicare Act,

even though the challenges are constitutional and the requested relief is injunctive.

Physician Hosps, 691 F.3d at 656 ("The Supreme Court has also explicitly rejected

the argument that constitutional challenges are free from Section 405(h)'s

requirements[]"); True Health Diagnostics, LLC v. Azar, 392 F. Supp. 3d 656, 662

(E.D. Tex. 2019) ("The term 'arising under' is broadly construed to encompass all

claims for relief, regardless of whether the claimant seeks benefits, or declaratory

or injunctive relief.").  Ultimately, a claim arises under the Medicare Act if the Act

provides the "standing and substantive basis for the presentation of the

constitutional contentions."  Physician Hosps., 691 F.3d at 656 (quoting Salfi, 422

U.S. at 760–61).  Here, just like the plaintiffs in Ill. Council and Physician Hosps.,

Plaintiffs ask the Court to hold that a law affecting future reimbursements is

unconstitutional.  These claims arise under the Medicare Act.

Plaintiffs argue that §1395ii does not incorporate Section 405(h)

channeling to the claims here because §1395ii incorporates Section 405(h) only to

the Medicare Act (or subchapter XVIII) and portions of the Drug Pricing Program

were established in subchapter XI.  However, Plaintiffs do in fact challenge

portions of subchapter XVIII, where portions of the Drug Pricing Program were

9

enacted, like Section 1395w-3a. (See Dkt # 1, at ¶ 21). Even so, a claim "arises under" the Medicare Act (or subchapter XVIII) when the claim is "inextricably intertwined" with a claim for Medicare payments, providing the standing and substantive basis for the claim. Am. Med. Hospice Care, LLC v. Azar, 2020 WL9814144, 5:20-cv-757, at *4 (W.D. Tex. Dec. 9, 2020) (citing Weinberger v. Salfi, 422 U.S. 749, 760–61 (1975), Heckler v. Ringer, 466 U.S. 602, 614–15 (1984)). Plaintiffs would not have standing or a substantive basis for a claim for reimbursement without the Medicare Act. Therefore, these claims arise under the Medicare Act and Section 405(h) channeling applies.

### B. "Complete Preclusion to Judicial Review" Exception

The Supreme Court has recognized an exception to the channeling doctrine, even when a claim arises under the Medicare Act, when "channeling a claim through the agency would result in the '*complete* preclusion of judicial review.'" Azar, 886 F.3d 496, 504–05 (5th Cir. 2018) (quoting Shalala, 529 U.S. 23 (2000)). "This exception is narrow…" Id. Therefore, Plaintiffs "must show either that bringing its claim administratively is a 'legal impossibility,' or that it faces a 'serious practical roadblock to having [its] claims reviewed in any capacity, administratively or judicially.'" Id. (quoting Physician Hosps., 691 F.3d at 505.)

Plaintiffs have not shown that there is "no way of having their claims reviewed[,]" either legally or practically. Physician Hosps., 691 F.3d at 659. There

are established avenues for administrative review of constitutional challenges to the IRA and requests for reimbursement.  See, e.g., 42 U.S.C. § 1395ff(b)(1), 1395ff(b)(2)(A).  Both the Medicare Act and CMS regulations offer expedited review of constitutional claims that Plaintiffs could use.  See 42 U.S.C. § 1395ff(b)(1)(F)(2); 42 C.F.R. § 405.990(c)(2).  Plaintiffs may bring a civil action only after the agency "determines that that are no material issues of fact in dispute and that the only issues to be adjudicate are ones of law or regulation that the Department of Appeals Board does not have authority to decide[.]"  42 U.S.C. § 1395ff(b)(2)(C).  While channeling may cause a time delay, delay-related hardships do not justify an exception.  Physician Hosps., 691 F.3d at 659.

Plaintiffs point to the bar of administrative review in 42 U.S.C. § 1320f-7(2)–(3).  (Dkt. # 47 at 19.)  Section 1320f-7 only bars administrative or judicial review of the certain aspects of the Drug Pricing Program, like the "determination of maximum fair price" or "the selection of drugs."  42 U.S.C. § 1320f-7(2)-(3).  It does not preclude administrative review for a constitutional challenge or a claim for reimbursement.  See 42 U.S.C. § 1320f-7(2)–(3); 42 U.S.C. § 1395ff(b)(1)(F)(2); 42 C.F.R. § 405.990(c)(2).  Plaintiffs are therefore not precluded from presenting their constitutional challenge to the Secretary, and the claims do not fall under the exception.

11

The Court lacks jurisdiction over NICA's claims because the claims here "arise under" the Medicare Act and the claims do not fall under the exception carved out for when claims may completely avoid judicial or administrative review. Therefore, NICA's claims are dismissed without prejudice.

II.     <u>With NICA dismissed, Venue is No Longer Proper in this District.</u>

Rather than asking the Court to dismiss PhRMA and GCCA's claims for lack of jurisdiction, Defendants ask the Court to instead dismiss the case for improper venue.

"Once defendants raise the issue of improper venue, the plaintiffs have the burden to prove that the chosen venue is proper." <u>EnviroGLAS Prods., Inc. v. EnviroGLAS Prods., LLC</u>, 705 F. Supp. 2d 560, 567 (N.D. Tex. 2010). Venue is proper in (1) judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction over such action. 28 U.S.C. § 1391(b)

Venue is only proper in the Western District of Texas because NICA resides here. (Dkt. # 1 at 8.) With NICA dismissed, no defendant would reside in

12

24-50180.625

this district, no plaintiff resides in this district, and nothing suggests that a substantial part of the events or omissions giving rise to the claim occurred in this district.  See 28 U.S.C. § 1391(e)(1).  Plaintiffs do not offer any reasons that venue would be proper in this district if NICA is dismissed.  (See Dkt. # 47 at 20.)

In the case of improper venue, the district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

Neither party offered a transferee venue.  More importantly, the same federal jurisdictional defect likely exists for PhRMA and GCCA, as nothing suggests that either party has presented its claims to the Secretary.  Therefore, in the interests of justice, the Court will dismiss the case without prejudice.

## CONCLUSION

For the reasons stated in this Order, the Court dismisses Plaintiff NICA for lack of subject matter jurisdiction under Fed. Rule of Civ. P. 12(b)(1) and dismisses the case for lack of venue under Fed. Rule of Civ. P. 12(b)(3). Defendants' Motion to Dismiss (Dkt. # 39) is therefore **GRANTED**, and Plaintiffs' Motion for Summary Judgment (Dkt. # 35) is **MOOTED**.  This dismissal is **WITHOUT PREJUDICE**.  The case shall be **CLOSED**.

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, February 12, 2024.

13

Hon. David Alan Ezra
Senior U.S. District Judge

14

Tab 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| NATIONAL INFUSION CENTER ASSOCATION, on behalf of itself and its members; GLOBAL COLON CANCER ASSOCIATION, on behalf of itself and its members; and PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, on behalf of itself and its members, <br><br>      Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services; the U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; and the CENTERS FOR MEDICARE AND MEDICAID SERVICES, <br><br>      Defendants. | CIVIL ACTION NO. 1:23-cv-00707 |

## COMPLAINT

Plaintiffs the National Infusion Center Association (NICA), the Global Colon Cancer Association (GCCA), and the Pharmaceutical Research and Manufacturers of America (PhRMA) allege as follows:

### INTRODUCTION

1.    America leads the world in pharmaceutical and biotechnology research, making the United States the dominant force for life-changing innovation. The American biopharmaceutical

and medical industries, including members of plaintiffs NICA and PhRMA, have saved and enhanced lives both at home and abroad by developing and administering cutting-edge, first-in-class medicines to prevent and treat a wide range of serious maladies, including cancers, cardiovascular conditions, autoimmune disorders, and infectious diseases. Conditions that were once fatal are now treatable thanks to advancements in pharmaceutical research. And conditions that were once treatable only with risky and expensive procedures, like surgery followed by lengthy hospital stays, are now treatable medically on an outpatient basis or at home, providing immeasurable health and economic benefits to patients.

2.      Companies have achieved these breakthroughs only by making enormous investments—and running enormous risks. It takes billions of dollars and years of effort to develop a single drug or therapeutic treatment. And anyone willing to invest those resources must take on extraordinarily unfavorable odds: Among the small share of investigational medicines that get as far as entering clinical trials, only 12% ever achieve approval by the U.S. Food and Drug Administration (FDA), and of those approved, only one in five will generate revenues that exceed the average cost of developing a medicine. *See* Joseph A. DiMasi et al., *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J. Health Econ. 20, 25–26 (2016), https://bit.ly/30UAIdg; John A. Vernon et al, *Drug Development Costs When Financial Risk is Measured Using the FAMA-French Three-Factor Model,* Health Econ 2010:19(8), https://onlinelibrary.wiley.com/doi/10.1002/hec.1538. The risk-reward calculus, moreover, is becoming even more precarious; development costs are rising steeply, while potential returns on investment are becoming slimmer and more uncertain as drug treatments become increasingly personalized. *See Research and Development in the Pharmaceutical Industry*, Congressional Budget Office 16–17 (Apr. 2021), https://www.cbo.gov/publication/57126; U.S. Dep't of Health

& Human Servs. & U.S. Food & Drug Admin., *Paving the Way for Personalized Medicine* 4 (Oct. 2013), https://bit.ly/3Vfj0un.

3.      Medicare has traditionally encouraged pharmaceutical innovation through market-based mechanisms. Since its inception, the program has reimbursed covered drugs in a manner that promotes patient access, while permitting pharmaceutical manufacturers the opportunity to earn competitive returns that encourage and fund future innovation. In particular, Congress sought to ensure that Medicare reimburses the costs of these drugs at rates based on prices negotiated in real market transactions.

4.      This market-based system for encouraging innovation benefits manufacturers, providers, and patients. Manufacturers of successful products, including members of PhRMA, can earn returns sufficient to fund further research and development. Providers of those products, including members of NICA, can receive reimbursements sufficient to support their operations—including operating outpatient facilities for administering biological treatments via infusion or injection. And patients, including those represented by GCCA, can receive innovative, cutting-edge treatments for serious medical conditions—even if they live in rural areas without extensive hospital capacity.

5.      Congress's recently enacted Inflation Reduction Act of 2022, Pub. L. 117-169 (IRA or the Act), however, upends this time-tested, market-based system for encouraging innovation. In its place, Congress established a system of price controls, seeking to reduce expenditures even at the cost of drastically slowing innovation, reducing drug availability, and worsening patient outcomes. But that type of scheme, if implemented transparently, would come at a high cost for Congress, resulting in significant public criticism and political blowback. Had Congress made

24-50180.13

clear that it was mandating price controls, the resulting drug shortages, rationing, and declining innovation would be clearly attributable to the elected officials who supported the law.

6.     With so much at stake—both practically and politically—the natural and prudent course would have been for Congress to carefully choose the mechanism for setting drug prices. And if Congress had simply established the price-setting mechanism itself, the need for procedural protections would have been plain: Similar price- and rate-setting mechanisms that Congress has established in the past all include safeguards against arbitrary or unreasonable governmental decision-making—such as clear standards to guide and constrain agency pricing decisions, to ensure fair compensation, and to protect consumers against market distortions, as well as meaningful judicial review to protect investment-backed expectations.

7.     But Congress opted for a very different course in the IRA. It adopted a novel, Byzantine structure that, at every turn, attempts to obscure the process by which prices are imposed. The resulting scheme eliminates transparency, avoids accountability, and attempts to foreclose judicial review. It is a sham.

8.     As an initial matter, Congress did not undertake the politically fraught task of setting drug prices itself, instead delegating nearly unfettered discretion to the Secretary of the Department of Health and Human Services (HHS). But rather than have HHS set prices transparently, the IRA attempts to disguise price controls set by government *fiat* through a deceptively named "Drug Price Negotiation Program" (Drug Pricing Program or Program). In fact, the Program involves no genuine "negotiation" at all. Instead, it *compels* pharmaceutical manufacturers to accept prices that are capped at whatever price HHS chooses, while setting no meaningful constraints on HHS's new price-setting powers.

9.      What is more, the Drug Pricing Program then forces manufacturers to deliver a government-approved message, compelling them to "agree" to the government-dictated price—what the law calls "the maximum fair price"—under threat of a crippling excise tax for non-acquiescence. The "tax" itself is staggering, reaching as high as *1,900%* of a manufacturer's *total U.S. revenues* for a drug. Worse still, the law provides for no price floor; HHS could take the position that a selected drug is worth $1 per dose, and the manufacturer must either sell at that price or take on massive liability. The only alternative provided is to exit the Medicare and Medicaid programs altogether, withdrawing not just the drug in question, but *all* of the manufacturer's drugs. But even that (practically infeasible) choice is constrained by a statutorily mandated delay of 11 to 23 months—during which time the manufacturer is forced to continue participating in the sham "negotiation." And providers are caught up in this morass as well, since their reimbursement rates are based on the price HHS imposes on the manufacturer.

10.      Finally, Congress insulated the program from accountability at every stage, from implementation to enforcement. At least as HHS reads the statute, HHS need not engage in notice-and-comment rulemaking or even solicit public comment regarding key aspects of the Program's implementation. Strikingly, the IRA's text purports to foreclose *all* administrative and judicial review of critical implementation decisions. And HHS, through the Centers for Medicare & Medicaid Services (CMS), now has proposed to prevent manufacturers from disclosing *any* information about the process by which the agency imposes its price controls.

11.      At bottom, HHS could decree any price it wants for a drug—no matter how low—and then force a manufacturer to "agree" that the price was "fair," without any meaningful ability to reach a different agreement or to walk away. And a manufacturer would then have no recourse to challenge that price determination, either administratively or through judicial review.

12. The so-called "Drug Price Negotiation Program," therefore, is no negotiation at all. It is a government mandate disguised as negotiation. And it is unconstitutional, on several grounds.

13. **First**, Congress has impermissibly delegated broad, unconstrained authority to HHS to set prices within Medicare, including between manufacturers and the private prescription drug plans that serve Medicare beneficiaries, in conflict with fundamental separation-of-powers and nondelegation principles. Congress set no meaningful constraints on the agency's exercise of this new price-setting authority. And the harms of that initial structural flaw are compounded further by the other novel and constitutionally suspect features of the program discussed below, all of which serve to avoid accountability. When all the suspect features are considered together, the statute's unconstitutionality is plain.

14. **Second**, the Program's excise-tax cudgel violates the Eighth Amendment's Excessive Fines Clause. The excise tax aims to force compliance with the sham negotiation scheme by imposing ruinous consequences on any pharmaceutical manufacturer that does not acquiesce. The tax is staggering: Imposed each day that a manufacturer has not expressed "agreement," it increases swiftly to *1,900% of a drug's total revenues*. By design, this tax functions as a penalty. And as a penalty, it is grossly disproportionate to the "offense" it seeks to punish: a manufacturer's unwillingness to agree to a government-mandated price. This penalty will not function as a tax; the Joint Committee on Taxation estimates it will raise literally *zero* revenue, as no rational manufacturer would ever pay it.

15. **Third**, the Program violates the Fifth Amendment's Due Process Clause by exempting key decisions from public input and insulating them from administrative or judicial review. Unlike virtually any other statutory program affecting the public, the Drug Pricing Program denies manufacturers, providers, and patients the right *both* to front-end input on how the

24-50180.16

Program will be implemented *and* to back-end judicial or administrative review after critical implementation decisions have been made. And CMS has proposed to make the process even less transparent by preventing manufacturers from disclosing *any* information about the process by which the agency imposes its price controls. The Program thus deprives pharmaceutical manufacturers of their constitutionally protected property interests—in their patent rights and common-law right to sell their products at market prices free from arbitrary governmental constraints—without affording constitutionally adequate procedural protections. Providers likewise have an interest in receiving the reimbursements to which they are statutorily entitled, as well as to continue operating their businesses and providing treatment to patients, yet the statute provides no adequate procedural protections for those interests either. Patients, affected most personally by the Drug Pricing Program, are deprived of their right to participate in the price-setting process that will determine whether they will continue to have access to potentially life-sustaining or life-extending treatments that they are currently taking or may be prescribed in the future, including those that may never come to the market because of the Drug Pricing Program.

16.     In addition to being unconstitutional, the Drug Pricing Program will harm patients, caregivers, physicians, and the broader public interest in pharmaceutical innovation. It will distort the marketplace, inhibit the development of critical new drugs, and disrupt access to needed treatments.

17.     For these reasons, and as explained below, Plaintiffs seek a permanent injunction against enforcement of the Drug Pricing Program and excise tax; a declaration that the Drug Pricing Program and excise tax are unconstitutional; a permanent injunction requiring implementation of procedures consistent with due process; a declaration that the procedures enacted by the IRA and implemented by HHS are inadequate; and other appropriate relief.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the laws of the United States), *id.* § 1346 (United States as a defendant). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

19.    Venue is proper in this district because this action seeks relief against federal agencies and officials acting in their official capacities, and Plaintiff NICA resides in this district. *See* 28 U.S.C. § 1391(e)(1).

## THE PARTIES

20.    NICA  is a non-profit corporation organized and existing under the laws of the State of Texas, where it also maintains its headquarters. NICA represents non-hospital, community-based infusion providers that allow patients to receive care safely and efficiently in high-quality, lower-cost settings. NICA's efforts are focused on promoting patient safety and care quality, ensuring delivery-channel sustainability and expansion, buy-and-bill protection, maintaining net positive reimbursement, and ensuring that patients have access to viable and sustainable alternatives to hospital care settings. NICA supports policies that improve drug affordability for beneficiaries and reduce disparities in quality of care and safety across care settings.

21.    Millions of patients rely on infusion medications to treat diseases like cancer and to manage complex chronic conditions like ulcerative colitis, multiple sclerosis, and lupus. NICA's members operate outpatient facilities to administer these types of treatments, receiving reimbursement from Medicare for services provided to Medicare patients. Currently, these providers generally are reimbursed by Medicare based on the average sales price of the drug and

8

for some related costs. NICA's members receive significant reimbursement revenue from drugs and treatments that are likely to be included in the IRA's Drug Pricing Program once the Program begins applying to provider-administered drugs under Medicare Part B and Part D. At that point, reimbursement rates for a significant and growing number of the treatments NICA members administer will be based on the IRA's "maximum fair price," and revenues will fall precipitously. NICA expects that these reimbursement changes will cause major revenue decreases for many of NICA's members and that, as a result, a substantial number of NICA's members will have no choice but to scale back operations, to reduce or eliminate the services they provide to Medicare patients, or even to go out of business. Those disruptions in turn will reduce Medicare patients' access to badly needed care. Some patients will to turn to higher-cost hospital care; others will turn to less-effective treatment options; and still others will forgo treatment altogether. The results will be higher costs for Medicare as well as Medicare Part B and Part D beneficiaries.

22. The Global Colon Cancer Association (GCCA) is a non-profit corporation organized and existing under the laws of the State of Delaware, with its headquarters located in Washington, DC. It acts as the voice for the millions of colon cancer patients worldwide by promoting access to quality medical treatments, advocating for patient-centered policy to ensure increased awareness and screening, and helping its member organizations collaborate and innovate. GCCA also supports the creation of new patient advocacy groups in developing areas that have no colon cancer organizations. The vision of GCCA is to create a global community in which people around the world can unite and battle this disease with one unified voice. Colon cancer patients participate directly in GCCA's activities. GCCA maintains a support community of patients and caregivers, mostly in the United States. And over 1,000 colon cancer patients and survivors participated in GCCA's recent Global Colorectal Cancer Congress, an international

24-50180.19

49.    Once "negotiation-eligible" drugs have been ranked, the IRA directs HHS to select an increasing number of the highest-ranked drugs for negotiation. Part D drugs will be selected for negotiation starting in 2023, with the first set of maximum fair prices for Part D drugs taking effect beginning in 2026; Part B is added to the selection process beginning in 2026, with maximum prices taking effect in 2028. *Id.* §§ 1320f–1(a)(1), 1320f–1(b)(1)(A), 1320f–1(a)(3)–(4). Ten Part D drugs will be selected for 2026, fifteen Part D drugs for 2027, fifteen Part D and Part B drugs for 2028, and twenty Part D and Part B drugs for 2029 and each year thereafter. *Id.* § 1320f–1(a)(1)–(4). This drug-selection process is cumulative: Once a drug is selected, it remains selected until HHS determines that a generic or biosimilar version of the drug is approved or licensed and marketed pursuant to that approval. *Id.* § 1320f–1(c)(1). The number of drugs subject to the Program thus mounts over time. It is expected that, within ten years, *half* of all Medicare drug spending will be for drugs whose price is set under this program.

The IRA Grants HHS Unfettered Discretion to Set "Maximum Fair Prices" Through Sham "Negotiations"

50.    Once innovative drugs are ranked and selected for negotiation, the IRA directs HHS to "enter into agreements" with manufacturers to set a "maximum fair price" (MFP) for the selected drugs. *Id.* § 1320f–2(a)(1). But these documents are not "agreements" in any meaningful sense; they are coerced through a sham negotiation process that bears no resemblance to any ordinary commercial negotiation. And the "negotiated" MFP of a drug is just a government-imposed price control, subject to a statutory ceiling but—with one narrow, time-limited exception—no floor. *Id.* § 1320f–3(c); *see id.* § 1320f–3(b)(2)(F)(ii) (creating temporary floor only for certain small biotech manufacturers).

51.    The IRA directs HHS to "develop and use a consistent methodology and process . . . for negotiations . . . that aims to achieve the *lowest* maximum fair price for each selected drug."

including research and development costs, unit costs, prior federal financial support, data on pending and approved patent applications, market data and revenue and sales volume data, and information about alternative treatments. *Id.* § 1320f–3(e). Yet it sets no criteria regarding how HHS is to weigh those factors. Nor does it set criteria regarding HHS's "offers," or the bases upon which HHS may reject a manufacturer's "counteroffer," except to say that HHS may *not* accept any counteroffer that exceeds the statutory ceiling. *Id.* § 1320f–3(b)(2)(F). Indeed, the Act creates no mechanism to ensure HHS creates a non-arbitrary process or consistently follows it.

54.    Moreover, the IRA restricts a manufacturer's ability to "counteroffer," dictating that a manufacturer "shall" justify its counteroffers only on certain specified factors: research and development costs, and the extent to which they have been recouped; current production and distribution costs; prior federal financial support for development; data on pending and approved patent applications; market data and revenue and sales volume data for the drug; and certain evidence regarding alternative treatments. *Id.* §§ 1320f–3(b)(2)(C)(ii), 1320f–3(e). Accordingly, unlike in commercial negotiations, manufacturers cannot make a counteroffer on the ground that revenue for an existing drug is needed to fund research into other drugs, or simply on the ground that the manufacturer believes that its product is worth more than was initially offered.

55.    Even more egregiously, the IRA requires manufacturers to "enter into an agreement" to accept whatever "maximum fair price[s]" HHS has chosen for the manufacturers' products. *Id.* §§ 1320f–2(a), 1320f–3(a). If they do not, they must pay a cripplingly high and rapidly escalating "excise tax," 26 U.S.C. § 5000D(b), which will be discussed further below. In other words, on the face of the law, manufacturers have no choice but to voice their assent to whatever price HHS ultimately demands. If they do not, they will be dealt massive penalties.

56.     Once HHS has imposed an MFP for a selected drug, the statute provides that the manufacturer must provide "access to such price to" a wide variety of individuals and entities participating in Medicare. 42 U.S.C. § 1320f–2(a)(1). These include all eligible individuals who are dispensed drugs under Medicare Parts B and D; all "pharmacies, mail order services, and other dispensers" that dispense drugs to Medicare beneficiaries; and all "hospitals, physicians, and other providers of services and suppliers" that furnished or administered drugs to Medicare beneficiaries. *Id.* § 1320f–2(a)(1)(A)–(B); *see id.* § 1320f(c)(2). But the statute contains no mechanism to ensure that MFP prices are made available only with respect to eligible patients. Manufacturers that fail to provide the required access to the MFP are subject to a civil monetary penalty of *ten times* the difference between the price the manufacturer actually makes available and the MFP, multiplied by the total number of units sold. *Id.* § 1320f–6(a).

HHS Enforces the Sham Negotiations Through a Crippling "Excise Tax"

57.     The hammer through which the Drug Pricing Program is enforced is the so-called "Excise Tax Imposed on Drug Manufacturers During Noncompliance Periods." IRA § 11003. In actual negotiations, of course, parties that fail to reach mutually agreeable terms do not finalize a deal and can simply walk away. Under the IRA, by contrast, a manufacturer that refuses to accede to the price HHS demands for one of the manufacturer's products cannot just walk away. Instead, it must pay a crippling penalty, amounting to multiples of *all* sales of the drug, both in the Medicare program and outside of it.

58.     Here is how it works. A manufacturer that fails to "agree" to a price is subject to an escalating penalty. 26 U.S.C. § 5000D(b). This penalty is disguised as an excise tax: Congress codified it in the portion of the Internal Revenue Code governing "Miscellaneous Excise Taxes."

23

*Provisions in the Inflation Reduction Act of 2022 (H.R. 5376)* 4 tbl. 2 (2022). Even using the lowest applicable percentage in the formula (65%), the daily penalty starts at approximately 186% of— nearly double—the manufacturer's daily sales revenue from the drug. *See id.* ("The excise tax rate would range from 185.71% to 1,900% of the selected drug's price depending on the duration of noncompliance."). Thus, the excise-tax penalty represents a multiple of the manufacturer's *total revenues* from the drug in question. A title summary of the predecessor legislation accurately described this as a "steep, escalating penalty" imposed on manufacturers who do not "agree to" the price HHS unilaterally selects. *See* Title Summary at 1, H.R. 3 (2022).

61.    In practice, of course, the crippling excise-tax penalty prevents manufacturers from doing anything but acquiescing to whatever price HHS demands. But the penalty also shapes the prices that HHS can foist upon manufacturers through the statute's sham "negotiation" process. HHS could, for example, decide to approach the "negotiations" by making a best and final "offer" that would impose serious financial losses on a manufacturer. Yet manufacturers would have no choice but to accept even a massive reduction in Medicare prices, rather than incur a nineteen-fold penalty on all sales of the drug.

62.    Congress well understood that, in practice, the threat of this ruinous excise tax would force manufacturers to accept whatever price HHS demands. The Joint Committee on Taxation estimated that an essentially identical excise-tax provision in predecessor legislation would raise "no revenue" whatsoever, because no manufacturer could possibly afford to pay it; instead, manufacturers will be forced to "agree" to HHS's chosen maximum "fair" price. Joint Comm. on Tax'n, *Estimated Budget Effects of the Revenue Provisions Of Title XIII - Committee On Ways And Means, of H.R. 5376, The "Build Back Better Act," As Passed by the House Of Representatives, Fiscal Years 2022–2031*, at 8 (Nov. 19, 2021), https://bit.ly/3plC4cd ("no

revenue effect"); *accord* Letter from P.L. Swagel, Director, Congressional Budget Office, to Hon. F. Pallone Jr., Chairman, Committee on Energy and Commerce (Oct. 11, 2019), at 14, *available at* https://bit.ly/3osZPzX.

63.     The IRA provides for the "[s]uspension" of the punitive excise-tax penalty, but only if the manufacturer terminates its Medicare Part D agreements and Medicaid rebate agreement— not just for the drug in question, but for *all* of the manufacturer's drugs. 26 U.S.C. § 5000D(c); *see id.* § 5000D(c)(1). Terminating the Medicaid rebate agreement would also result in all of the manufacturer's products losing Part B coverage, because for a drug to be payable under Part B, "the manufacturer must have entered into and have in effect a [Medicaid] rebate agreement." 42 U.S.C. § 1396r-8(a)(1). Thus, a pharmaceutical manufacturer must entirely cease participation in both Medicare and Medicaid in order to suspend application of the tax penalty.

64.     But the IRA constrains manufacturers from taking even that drastic step: The Act expressly delays a manufacturer's ability to exit from Part D—and thus compels them to participate in it—*for between 11 and 23 months*. *See id.* § 1395w-114a(b)(1)(C)(ii); *id.* § 1395w–114c(b)(4)(B)(ii); *id.* § 1395w–153(a)(1). If a manufacturer's Part D drugs were selected for forced "negotiation" during this period, then the manufacturer would have no choice but to acquiesce to HHS's chosen "maximum fair price" or pay the crippling excise tax until it is finally permitted to leave the program. *See* 26 U.S.C. § 5000D(c)(1). Indeed, to exit Part D in time to avoid being penalized for failing to sign an "agreement" for 2026 by the statutory deadline of October 1, 2023, *see* 42 U.S.C. § 1320f-2(a), a manufacturer would have had to provide a termination notice to HHS by January 29, 2022—months before the IRA was even enacted into law. And that termination would exclude all of the manufacturers' products from coverage under Part D indefinitely starting in 2023—years before the actual price controls would take effect in 2026.

24-50180.36

The IRA Exempts Key Decisions from Public Input and Insulates Them from Administrative or Judicial Review

65.     Pharmaceutical manufacturers face serious burdens from the IRA's faux negotiation process and mandatory price controls. They must sell their products at government-controlled prices, reevaluate the viability of their entire pipeline of products in development, and reduce and reallocate their research and development spending.

66.     Providers face similarly serious burdens. For example, NICA's infusion-center members currently earn margins of approximately 0-4% when providing infusion treatments to Medicare patients, who make up 30-60% of their patients. But the vast majority of Medicare reimbursements that NICA's members receive come from reimbursements for the drugs themselves (as opposed to reimbursements for infusion service charges). If the prices for those drugs are subject to an arbitrary ceiling, the margins that NICA members earn on those drugs will decrease, causing them to incur losses on services to Medicare patients. NICA members then will face a choice between cutting back or eliminating services for Medicare patients or going out of business. The end result in either scenario will be to force Medicare patients to receive infusion services in higher-cost hospital settings, while harming NICA's members—which provide infusion services at a lower overall price point.

67.      Despite these burdens, manufacturers, providers, patients, and other affected parties are given no say in how HHS decides to implement the program, and they are deprived of legal recourse regarding numerous critical decisions.

68.     On the front end, there is no right to participate in the implementation process. The Administrative Procedure Act sets forth general procedural requirements for agency rulemaking, including provisions requiring the agency to publish a notice of proposed rules in the Federal Register and to give interested persons an opportunity to submit written comments, which the

27

agency in turn must consider. 5 U.S.C. § 553(b), (c). And the Social Security Act requires HHS to follow those procedural requirements when engaging in substantive rulemaking in Medicare. *See* 42 U.S.C. § 1395hh. The IRA, however, provides that HHS "shall implement this section, including the amendments made by this section, for 2026, 2027, and 2028, by program instruction or other forms of program guidance." IRA §§ 11001(c), 11002(c). And CMS has interpreted that language to mean that implementation "is not subject to the notice-and-comment requirements of the Administrative Procedure Act or the Medicare statute." *See* Ctr. for Medicare, Medicare Drug Price Negotiation Program: Initial Memorandum, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2026, and Solicitation of Comments 2 (March 15, 2023) (Initial Guidance). In other words, according to the agency, the statute contemplates that the implementation of this groundbreaking new drug price pricing program need not go through any notice-and-comment rulemaking process *at least through 2028*, including the program's most formative years. Even after that point, the IRA itself does not provide *any* mechanism for affected persons or entities—including pharmaceutical manufacturers that will be subject to price controls and providers that will have their reimbursement rates slashed—to observe, comment on, or contribute to the process through which HHS decides what prices to impose. Manufacturers do not even have any right to have a say in requirements that HHS may unilaterally impose and then seek to enforce through a $1 million-per-day fine.

69.    On the back end, the IRA insulates critical implementation decisions from review. It provides that "[t]here shall be no administrative or judicial review" of a number of HHS's key determinations, including "[t]he selection of drugs," "the determination of negotiation-eligible drugs," "the determination of qualifying single source drugs," and "[t]he determination of a maximum fair price under [the Act]." 42 U.S.C. § 1320f–7(2)–(3). Taken literally, this provision

28

would preclude administrative or judicial review of some of the most critical determinations under this new program.

70.     While these provisions limiting front-end public comment and back-end administrative and judicial review are unusual in isolation, in combination they are nothing short of extraordinary. NICA, GCCA, and PhRMA are not aware of any other statute that comprehensively bars *all* external input into and review of an agency decision-making process that will have such profound effects on the public—to the point of upending the finances of an entire critical industry. These provisions deprive stakeholders—including pharmaceutical manufacturers, medical providers, and their patients—of all possible procedural safeguards regarding important implementation decisions before they are made and once they are in place.

### The IRA's Novel Structure Violates Fundamental Nondelegation and Separation-of-Powers Principles

71.     Article I, section 1 of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." As Chief Justice Marshall explained, that provision means that Congress may not "delegate to [other branches] powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825). Indeed, "[t]hat congress cannot delegate legislative power to the [executive branch] is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). The Supreme Court has twice struck down statutes as violating these principles. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935). The Fifth Circuit recently has done so as well. *See Jarkesy v. SEC*, 34 F.4th 446, 459-63 (5th Cir. 2022). As the Supreme Court has unanimously reiterated, Congress may not "transfer[] its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality

op.); *see id.* at 2130 (Alito, J., concurring in the judgment) (similar); *id.* at 2133-35 (Gorsuch, J., dissenting) (similar). And in evaluating a statute's compliance with the nondelegation doctrine, the availability of "judicial review" and "mandated compliance with . . . requirements for notice and comment" are relevant factors. *United States v. Garfinkel*, 29 F.3d 451, 459 (8th Cir. 1994) (citation omitted).

72.     The nondelegation doctrine accords with larger separation-of-powers principles. The Framers "split the atom of sovereignty itself into one Federal Government and the States," and "then divided the powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial." *Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2202 (2020) (quotation marks omitted). "The resulting constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections." *Id.* at 2203. Congress "contravenes this carefully calibrated system" if it "vest[s] significant governmental power in the hands of a single individual accountable to no one." *Id.*; *see Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 640 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) (similar). And "'[p]erhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is a lack of historical precedent' to support it." *Seila L.*, 140 S. Ct. at 2201 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)).

73.     The price control scheme Congress established in the IRA is entirely novel.

74.     In the past, when Congress wished to displace market mechanisms in favor of agency-set prices, it has followed a well-established path: clearly specifying a substantive legal standard by which the agency is to set rates, imposing appropriate procedural safeguards to protect the interests of the regulated parties and ensure pricing meets the needs of the public, and providing

for appropriate judicial review. *See*, *e.g.*, 15 U.S.C. §§ 717c, 717r; 16 U.S.C. §§ 824d, 824e; 39 U.S.C. § 3622.

75.     Instead of following that established course, Congress took a different, novel, and *unconstitutional* path in the IRA: Congress delegated unfettered discretion to HHS to set prices however it wishes.

76.     To begin with, while the Act directs the agency to consider certain "factors" when setting prices, 42 U.S.C. § 1320f–3(e), it provides no guidance whatsoever about how the agency should weigh those factors and sets no concrete limits on the agency's ultimate discretion to choose prices. At most, the statute sets a ceiling price the agency must not exceed, *see* 42 U.S.C. § 1320f–3(b)(2)(F), (c), while directing HHS to "develop and use a consistent methodology and process . . . that aims to achieve the *lowest* maximum fair price," *id.* § 1320f–3(b)(1) (emphasis added). In effect, HHS has been given the open-ended task of replacing market prices for Medicare's highest-spend drugs with an entirely new set of prices that can go as low as the agency chooses.

77.     Furthermore, key terms of the IRA are sufficiently open-ended to allow HHS to claim authority to make fundamental policy choices. For example, at least as HHS reads it, the statute does not specify whether and when multiple products qualify as a single negotiation-eligible drug, such that their separate total expenditures are counted together for purposes of HHS's rankings. HHS likewise reads the statute not to specify what it means for a generic drug or biosimilar product to be "marketed," such that the reference drug or biological product would not be eligible for selection or would be removed from the selected drug list. And HHS has asserted wide discretion regarding what expenditures are included in and excluded from the "total expenditures" that determine the rankings. *See supra*, ¶ 47. This claimed discretion leaves HHS with the authority to make key substantive

decisions regarding not only which drugs are negotiation eligible, but also for how long selected drugs remain subject to MFP negotiation.

78.     At the same time, the Act includes no safeguards to protect the interests of manufacturers, providers, patients, or the public. The Act does not require HHS to undertake notice-and-comment rulemaking, or even to solicit external input at all. And the draconian excise tax virtually guarantees that manufacturers have no way to protect their interests or resist arbitrary agency decision-making. Punitive in nature and wildly disproportionate to the conduct it seeks to punish, the tax further aggrandizes HHS's power, ensuring that no manufacturer will be able to resist even the agency's most extortionate price controls. *See infra*, ¶¶ 93–104.

79.     Finally, the Act seeks to insulate many of the most important implementation decisions from any judicial review. *See* 42 U.S.C. § 1320f–7. This bar on all back-end judicial review of key implementation decisions raises particularly acute separation-of-powers concerns. Permitting an agency to resolve basic interpretive questions regarding a statute it administers without *any* possibility of judicial review is the equivalent of permitting an agency to rewrite those statutory provisions—a wholly legislative function. After all, the agency could adopt, implement, and enforce a reading of the statute that was clearly contrary to the text and Congress's intent, and then attempt to claim that no administrative or judicial review is available to correct the agency's overreach.

80.     At the extreme, HHS could—with complete impunity—willfully ignore one of the few binding constraints the statute imposes on its new price-setting authority. For example, even though the statute provides that a drug product is not a qualifying single source drug unless it has been approved by FDA for seven years, *see* 42 U.S.C. § 1320f–1(e)(1)(A), HHS could decide to ignore that requirement, selecting a blockbuster drug for negotiation after just one year because,

in the agency's view, expenditures for that drug were particularly high. The manufacturer then could try to challenge that patently unlawful decision in court, but HHS could cite the IRA's judicial review bar, which provides that "[t]here shall be no administrative or judicial review" of "[t]he selection of drugs" or "the determination of qualifying single source drugs." 42 U.S.C. § 1320f–7(2)–(3). And this is just one example—HHS could ignore many other clear-cut statutory requirements and still claim that the statute insulates the agency's lawlessness from any outside review.

81.     Each of these defects, standing alone, violates bedrock constitutional principles. But taken together—and especially in combination with several other, equally flawed provisions—the IRA's novel structure concentrates substantial power over a significant part of the economy in an administrative agency with no checks to ensure public accountability. That combination is fatal to the Act.

82.     These dangers are not just theoretical—CMS has already begun to exercise the full extent of its immense authority to define the parameters of the Drug Pricing Program with no opportunity for input or review. On March 15, 2023, CMS issued initial guidance regarding implementation of the IRA's drug selection and pricing scheme. *See* Initial Guidance. The Initial Guidance's stated purpose "is to provide interested parties with initial guidance regarding implementation of [certain sections] of the [IRA]." *Id.* at 1.

83.     The Initial Guidance demonstrates the unbounded authority that the IRA delegates to HHS, and the manner in which HHS will push that authority to its limits absent substantive constraints or external input and review. For example, Section 30 of the Initial Guidance sets forth the agency's final view—adopted without notice and comment—on the selection of negotiation-eligible "qualifying single source drugs" for 2026. *See id.* at 5. Most notably, Section 30 states that

CMS will "identify a potential qualifying single source drug using . . . all dosage forms and strengths of the drug with the same active moiety and the same holder of a New Drug Application (NDA), inclusive of products that are marketed pursuant to different NDAs." *Id.* at 8 (footnote omitted).[3] Under Section 30, two distinct drugs that treat two different diseases but share the same active moiety will thus be treated as a qualifying single source drug so long as they have the same NDA holder.

84. This broad interpretation—which strays far from the statutory text—will ensnare large numbers of distinct drug products within the Drug Pricing Program, disrupt manufacturers' phased drug-development processes, and drastically undermine manufacturers' ability to recoup investments on existing drugs. Manufacturers often invest considerable resources to research an existing drug's safety and effectiveness for new patient populations, for example. They also may develop new dosage forms for existing active moieties, such as a tablet or capsule versus an intravenous infusion, or new formulations, such as extended-release or abuse-resistant formulations. These new drug products can provide enormous benefits to patients and caregivers, and under a less expansive interpretation of the statute, at least some of these different products could qualify as distinct qualifying single source drugs. Under the agency's Guidance, however—which the agency specified was "final" in this regard and not subject to notice and comment—all of these different products are lumped together.

85. Combining distinct products can have the effect of eliminating much of the period of market pricing that the IRA purports to preserve. Consider a manufacturer that holds NDAs for Drug A and Drug B, each of which is marketed under separate new drug applications pursuant to

---

[3] A drug's "active moiety" "is the molecule or ion . . . responsible for the physiological or pharmacological action of the drug substance." 21 C.F.R. § 314.3.

21 U.S.C. § 355(c) and is not the reference listed drug for generic competitors. Drug A has been on the market for fifteen years, while Drug B has been on the market only for two years. Under Section 30, if Drug A and Drug B share an active moiety, they will be treated collectively as one qualifying single source drug. And because Drug A has been on the market for more than seven years, the combined "drug" will be negotiation-eligible, *see* 42 U.S.C. § 1320f–1(e)(1)(A), even though Drug B has been on the market for only two years. The manufacturer thus stands to lose five years of market pricing for—and five years' opportunity to recoup its investment in—Drug B.

86.     That interpretation eliminates incentives for manufacturers to continue research and development for existing drugs. Under the broad definition of qualifying single source drug set forth in Section 30, a manufacturer has no reason to invest years and billions of dollars of resources researching whether an active moiety in an existing drug could also be used to treat a different patient population, for example, or could be delivered in a new dosage form or formulation. If the manufacturer continues to innovate in one of these ways, the new drug's eligibility for MFP negotiation will be tied to the eligibility timeline of the existing drug, preventing the manufacturer from earning market returns on the new drug for the full period the statute authorizes.

87.     These harms are not limited to the selection of qualifying single source drugs for MFP price setting in 2026. The scope of what constitutes a qualifying single source drug carries through the Drug Pricing Program and determines where an eligible drug is ranked for possible negotiation, *see* 42 U.S.C. § 1320f–1(b)(1)(A), as well as the maximum-fair-price ceiling if the drug is selected, *see id.* § 1320f–3(c).

88.     Treating multiple products as one qualifying single source drug also harms providers and patients. As explained, when a provider-administered product is selected for price

35

controls under the Drug Pricing Program, reimbursements for administering the drug decrease along with the price. Consequently, if more distinct products are lumped together and included in the Program, a broader swath of the treatments providers administer will have their reimbursement rates slashed. Some existing treatments may no longer be offered to patients who need them, and future treatments may never be developed.

89.      Other aspects of the Initial Guidance similarly abuse the statutory text. The statute provides that a drug or biological product is not eligible for price setting if it faces competition from a generic drug or biosimilar that has been "marketed." 42 U.S.C. § 1320f–1(e)(1)(A), (B). The Initial Guidance states, however, that "CMS will review [Medicare Part D claims] data … during [a] 12-month period … and will consider a generic drug or biosimilar biological product to be marketed when that data reveal that the manufacturer of that drug or product has engaged in *bona fide marketing* of that drug or product." Initial Guidance, *supra*, at 10 (emphasis added). In other words, to determine whether a drug or product has been "marketed," CMS will review data showing only whether the drug or product has been prescribed to Medicare Part D beneficiaries and whether Part D insurance plans cover it. There is no statutory basis for this "bona fide marketing" standard. Nor is there a statutory basis for CMS's statement that it plans to "monitor the manufacturers of generics or biosimilar biological products to ensure they are engaging in bona fide marketing." *Id.* And again, CMS promulgated this Guidance without allowing for notice and comment from stakeholders.

90.      Still other aspects of the Initial Guidance further underscore the broad authority that HHS has assumed under the IRA. For example, the Initial Guidance proposes a gag rule, stating that "CMS intends to require that a [manufacturer of a drug selected for negotiation] shall not disclose to the public any information in the initial offer or any subsequent offer by CMS, the

ceiling price contained in any offer, or any information contained in any concise justification provided with an offer." *Id.* at 30. At the same time, the Guidance incorporates only a cursory, one-line statement indicating that "CMS intends to implement a confidentiality policy" to protect proprietary information that manufacturers submit during the negotiation process. *Id.* at 29. The Initial Guidance thus exacerbates the already one-sided "negotiation" process: HHS may demand whatever proprietary information it wants from manufacturers—on pain of massive daily fines and with no guarantees of confidentiality or information security—while simultaneously demanding that manufacturers "agree" to agency-imposed prices and prohibiting manufacturers from disclosing any information about the process that led to those prices.

91.     CMS adopted its interpretation of "qualifying single source drug" and "market[ing]" as final for 2026, without notice or any opportunity for manufacturers, providers, patients, or the public to comment. *See id.* at 2, 7-10. And while CMS voluntarily solicited comments on other aspects of the Drug Price Negotiation Program, it has made no commitment to consider or respond to the comments received in any substantive way. Furthermore, the agency has reserved the right to "make changes to any policies, including policies on which CMS has not expressly solicited comment," at any time. *Id.* at 2. Manufacturers and others submitting comments thus have no assurance that CMS will actually take their comments into account, or that it will not later completely change its implementation approach in the future, again without notice and an opportunity for comment.

92.     The Initial Guidance is thus an early and clear example of the extreme manner in which HHS intends to wield the broad authority Congress has delegated under the IRA, and evidence of the significant harms that will flow to pharmaceutical manufacturers and innovation in the United States as a result.

24-50180.47

tax penalty and the harm caused by the offense; and because no comparable sanctions are imposed for similar actions, the penalty is clearly grossly disproportionate in violation of the Excessive Fines Clause.

### *The MFP Provisions Do Not Provide Even Rudimentary Due Process*

105.     The Due Process Clause of the Fifth Amendment prohibits the federal government from "depriv[ing]" a person of "life, liberty, or property without due process of law." The government violates procedural due process where (1) it deprives a plaintiff of a constitutionally protected liberty or property interest (2) without following constitutionally sufficient procedures. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

106.     The IRA deprives pharmaceutical manufacturers of constitutionally protected property interests—their investment-backed patent rights and common-law right to sell their products at market prices free from arbitrary and inadequately disclosed governmental constraints. The IRA does the same to providers, who will suffer significant losses from arbitrarily reduced reimbursement rates, to the point of being driven out of business. And the statute creates the conditions to deprive patients of current and future medicines that may in many cases be life-sustaining or life-extending. And the IRA does so without following constitutionally sufficient procedures: The statute affords manufacturers, providers, and patients *no* opportunity to be heard regarding key decisions that HHS needs to make in order to implement the Act during the first three years and simultaneously deprives them of any judicial review of those decisions. The combined result is to deny manufacturers, providers, and patients even the most rudimentary process for some of the most consequential issues affecting their vital interests.

24-50180.53

128.    Indeed, CMS's promulgation of the Initial Guidance lacked even rudimentary due process. CMS claimed that the IRA exempted the Initial Guidance from APA notice-and-comment procedures. *See* Initial Guidance, *supra*, at 2. CMS thus provided manufacturers and providers with *no* opportunity for input into fundamental decisions, including the definitional guidelines that will determine what drugs will be eligible for MFP negotiation. For instance, CMS adopted an extremely broad definition of qualifying single source drug and an extremely narrow definition of generic or biosimilar "market[ing]." CMS also refused to even commit to publicly releasing the final text of the "agreement" manufacturers will be forced to sign before the selected drug list for 2026 is published—much less to allow manufacturers to review and comment on it. *See* Initial Guidance, *supra*, at 27 (stating only that "CMS will make reasonable efforts to make the final text of the Agreement available to the public before the selected drug list for initial price applicability year 2026 is published"). And CMS did so through a decision-making process that manufacturers, providers and patients could not observe, comment on, or contribute to and for which the IRA purports to bar *any* administrative or judicial review. *See* 42 U.S.C. § 1320f–7(2)–(3).

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

#### (Nondelegation – Separation of Powers)

129.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

130.    The Constitution provides that "All legislative Powers . . . shall be vested in a Congress of the United States." U.S. Const., Art. I, § 1. Accordingly, Congress cannot delegate to other branches of government the authority to make basic policy decisions that the Constitution vests exclusively in the Legislature.

131.    Consistent with that principle, when Congress has in the past sought to displace market mechanisms and authorize a government agency to set pricing, it has traditionally taken care to guard against arbitrary agency action: specifying the substantive legal standard by which the agency will set rates and prices; building in procedural protections to ensure that prices are reasonable and protect the interests of sellers, while simultaneously safeguarding the public's interest in avoiding market distortions and shortages; and imposing judicial review as an independent check against improper or erroneous administrative decision-making.

132.    The IRA provides no such protections. Congress granted HHS virtually unfettered discretion to set drug prices, and provided no substantive guidance or intelligible principle other than to specify the minimum discount the agency could accept. Congress also provided no opportunity for input by manufacturers, providers, patients, or the public, nor any mechanism for external review of the agency's decisions—and indeed, barred judicial review of many decisions critical to pricing determinations under the Act.

133.    The IRA executes this impermissible arrogation of unfettered legislative power to CMS by denying manufacturers any practical way to escape the price setting regime. The statute leaves manufacturers subject to the IRA with three untenable options: (a) agree to whatever price the government demands, even if the price does not remotely approximate the drug's market price; (b) pay a massive excise tax that escalates to 1900% of the drug's total revenues; or (c) give notice for all of the manufacturer's drugs to exit the Medicare and Medicaid programs, but wait 11-23 months before that termination takes effect. Through the creation of this Hobson's choice for drug manufacturers, Congress transferred legislative power to CMS in violation of Article 1, Section 1 of the U.S. Constitution.

134.    The IRA Drug Pricing Program is therefore unconstitutional under nondelegation and separation-of-powers principles and must be enjoined.

### SECOND CLAIM FOR RELIEF

### (Eighth Amendment – Excessive Fines Clause)

135.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

136.    The Eighth Amendment bars the imposition of excessive criminal fines and excessive civil fines designed at least in part to punish.

137.    A fine is unconstitutional under the Eighth Amendment where the amount of the fine is grossly disproportionate to the gravity of the offense that the fine is designed to punish.

138.    Although labeled a "tax," the IRA's excise tax functions as a penalty. The excise tax punishes manufacturers that fail to participate in the IRA's compelled-negotiation process in order to force manufacturer compliance with the IRA. And in so doing, the excise tax harms providers as well.

139.    The excise-tax penalty is grossly disproportionate to the culpability of the conduct that it punishes. The size of the excise-tax penalty is staggering, reaching as high as 1900% of the total daily revenues for all sales of the relevant drug and compounding for each day of "noncompliance." At the same time, the supposed "offense" that the excise-tax penalty is designed to punish—a manufacturer's mere refusal to "agree" upon a price—is not normally considered to be misconduct at all, let alone egregiously unlawful conduct.

140.    No other statute imposes similarly severe sanctions on comparable "misconduct."

141.    The IRA excise tax is therefore unconstitutional under the Eighth Amendment Excessive Fines Clause and must be enjoined.

### *THIRD CLAIM FOR RELIEF*

### (Fifth Amendment – Due Process)

142.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

143.    The Fifth Amendment Due Process Clause prohibits the government from depriving a person or entity of a constitutionally protected property interest without following constitutionally sufficient procedures.

144.    The IRA Drug Pricing Program deprives pharmaceutical manufacturers of two constitutionally protected property interests: their investment-backed patent rights and common-law right to sell their products at market prices free from arbitrary and inadequately disclosed governmental constraints. It also deprives providers of their interest in adequate reimbursement—in some cases threatening their ability to continue serving Medicare patients or even to stay in business—and it deprives patients of their access to life-sustaining and life-extending medicines.

145.    This deprivation is not voluntary.

146.    The IRA Drug Pricing Program forces this deprivation without following constitutionally sufficient procedures. The Act denies pharmaceutical manufacturers, providers, and patients even the most rudimentary process, by failing to provide manufacturers, providers, and patients with any opportunity to weigh in on key determinations by HHS on the "front" end (*i.e.*, before decisions are made) and by foreclosing judicial and administrative review of those determinations on the "back" end (*i.e.*, after decisions have been made).

147.    The risk of erroneous deprivation resulting from this lack of process is high, and the government has no legitimate interest in insulating HHS's decisions from manufacturer, provider, or patient input or judicial review.

Tab 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| NATIONAL INFUSION CENTER ASSOCATION, on behalf of itself and its members; GLOBAL COLON CANCER ASSOCATION, on behalf of itself and its members; and PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, on behalf of itself and its members, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services; the U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; and the CENTERS FOR MEDICARE AND MEDICAID SERVICES, <br><br> Defendants. | Civil Action No. 1:23-cv-00707 |

## DECLARATION OF BRIAN ZWEBEN

I, Brian Zweben, declare and state as follows:

1.      I am over eighteen (18) years of age, am of sound mind, and have never been convicted of a felony. I am fully capable and competent to testify to and have personal knowledge of the matters stated in this declaration. Every statement of fact contained herein is true and correct to the best of my knowledge.

2.      I am the President of BioTek reMEDys ("BioTek"). BioTek is an integrated infusion therapy provider and specialty pharmacy that supplies therapies, biologics, and pharma-ceuticals to patients suffering from chronic conditions and rare diseases.

1

3.      BioTek consists of three entities, which are individually and collectively members of the National Infusion Center Association ("NICA"). Valustar, LLC ("BioTek South") is a Delaware limited liability company doing business in Texas. AZBDBR, LLC ("BioTek West") is a Delaware limited liability company doing business in Arizona. BioTek reMEDys, Inc. ("BioTek Parent") is a Delaware corporation doing business in Delaware and owns 100% of BioTek South and BioTek West. The three BioTek entities are referred to collectively herein as "BioTek." BioTek has been a member of NICA since at least 2020.

4.      BioTek West, BioTek South, and BioTek Parent dispense pharmaceuticals through their specialty pharmacies and are frequently reimbursed for those pharmaceuticals under Medicare Part D. BioTek also administers pharmaceuticals directly through infusion therapy and is frequently reimbursed for those pharmaceuticals under Medicare Part B. Medicare patients make up a large proportion of the patients to whom BioTek provides pharmaceuticals and infusion therapy.

5.      One of the drugs administered and dispensed by BioTek South, BioTek West, and BioTek Parent is Stelara (ustekinumab). The first dose of Stelara is generally administered intravenously, while subsequent doses are self-administered via injection. When BioTek administers Stelara to a patient intravenously at one of its infusion centers, BioTek is reimbursed under Part B. When BioTek dispenses Stelara to a patient through one of its pharmacies for self-administered injections by the patients, BioTek is reimbursed under Part D.

6.      Pursuant to 28 U.S.C. § 1746 and other appliable law, I declare under penalty of perjury that the foregoing is true and correct, and within my personal knowledge.

Executed this 19 day of September, 2023.

Brian Zweben

Digitally signed by Brian Zweben
Date: 2023.09.19 16:27:09
-04'00'

_____
Brian Zweben

24-50180.558

Tab 6

DocuSign Envelope ID: C5D3EF24-92DD-44EF-BB77-25E2D2DCA95E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| NATIONAL INFUSION CENTER ASSOCATION, on behalf of itself and its members; GLOBAL COLON CANCER ASSOCATION, on behalf of itself and its members; and PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, on behalf of itself and its members,<br><br>      Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services; the U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; and the CENTERS FOR MEDICARE AND MEDICAID SERVICES,<br><br>      Defendants. | Civil Action No. 1:23-cv-00707 |

**SUPPLEMENTAL DECLARATION OF BRIAN NYQUIST**

I, Brian James Nyquist, declare and state as follows:

1.      I am over eighteen (18) years of age, am of sound mind, and have never been convicted of a felony. I am fully capable and competent to testify to and have personal knowledge of the matters stated in this declaration. Every statement of fact contained herein is true and correct to the best of my knowledge.

2.      I am the chief executive officer of the National Infusion Center Association ("NICA"), a nonprofit trade association. NICA is the nation's voice for non-hospital, community-based infusion providers.

1

DocuSign Envelope ID: C5B3EF24-9CDD-44EE-BB77-25E9D2BCAB5E

3.      "Infusion" or "infusion therapy" refers to the delivery of medications directly into the veins of a patient.  Infusion therapies typically are used when oral medications are insufficient, inappropriate, or unavailable.  Many of the newest and most effective treatments are therapeutic biological products (or "biologics") derived from living cells.  Biologics cannot be taken orally in pill form, as they will not remain molecularly stable and effective after exposure to the digestive system.  Thus, they must be administered directly into the blood stream intravenously via infusion therapy or indirectly via injection therapy.

4.      Biologics are critical treatments for many chronic diseases. They reduce healthcare consumption by decreasing the use of opioid-based pain medications, optimizing health outcomes, and maximizing quality of life. Most importantly, biologics minimize the physical, emotional, and economic burdens of disease. Innovative drugs and biologics save patients' lives.

5.      Certain biologics therapies must be administered and supervised by a medical provider, and patients needing those treatments traditionally have two options for receiving them: infusion centers or hospitals. Infusion centers are non-hospital locations, such as specialist physicians' offices or freestanding ambulatory centers, where drug treatments can be administered by an appropriate provider. Hospitals also offer these therapies, but hospital administration is typically more expensive and takes longer than administration at an infusion center.

6.      Millions of patients rely on biologics to treat a variety of complex, chronic conditions. Many of the newest infusible medications are used to treat autoimmune conditions, which are diseases in which the body's immune system turns on itself, attacking healthy cells mistaking them as foreign cells. Examples of autoimmune disorders include inflammatory bowel diseases, including Crohn's disease and ulcerative colitis; rheumatoid arthritis; multiple sclerosis; psoriasis;

DocuSign Envelope ID: C5B3EF24-9CBD-44EF-8B77-25E9D2BCADB5

psoriatic arthritis; and lupus. Infusion therapy is also used to treat other conditions, such as resistant infections, many types of cancer, migraines, osteoporosis, osteoarthritis, and hemophilia.

7.     In general, patients receiving infusion therapies require such treatment because (1) their condition is unresponsive to, or difficult to treat with, conventional treatment modalities; (2) the patient has exhausted conventional treatment options; or (3) the patient's condition is so aggressive and severe that, in their physician's medical opinion, a therapeutic biologic is necessary.

8.     NICA's members are in the business of extending and improving patients' lives by providing them with new and innovative drugs and biologics. To continue serving patients, NICA members must earn a margin on the infusion services and pharmaceuticals they provide. That margin consists of the difference between (a) the cost incurred to acquire and provide pharmaceuticals and infusion treatments to the patient; and (b) the revenue generated by providing the infusion service and/or pharmaceuticals, which historically is based on the average sales price (ASP) of the pharmaceutical plus 6%, plus a reimbursement amount for the administration services. The margin earned by NICA members on infusion services and pharmaceuticals allows NICA members to cover operating costs, maintain fiscal solvency, and continue serving patients. Most of NICA's members are small businesses that are already struggling to subsist on narrow margins. If those margins are compressed, NICA members will suffer financial harm, and some may go out of business.

9.     Medicare beneficiaries constitute a high proportion of patients in the majority of infusion centers—including NICA's members. For some infusion centers, Medicare patients are the vast majority of the patients that provider serves.

3

10. NICA members that provide infusion services and pharmaceuticals to Medicare patients are reimbursed through both Part B and Part D.

11. For example, BioTek reMEDys ("BioTek") is an integrated infusion therapy provider and specialty pharmacy that supplies therapies, biologics, and pharmaceuticals to patients suffering from chronic conditions and rare diseases. BioTek dispenses pharmaceuticals through their specialty pharmacies and is frequently reimbursed for those pharmaceuticals under Medicare Part D. BioTek also administers pharmaceuticals directly through infusion therapy and is frequently reimbursed for those pharmaceuticals under Medicare Part B. BioTek has been a member of NICA since at least 2020.

12. One of the drugs administered and dispensed by BioTek is Stelara® (ustekinumab). The first dose of Stelara® is generally administered intravenously, while subsequent doses are self-administered via injection. When BioTek administers Stelara® to a patient intravenously at one of its infusion centers, BioTek is reimbursed under Part B. When BioTek dispenses Stelara® to a patient for self-administered injections, BioTek is reimbursed under Part D. Other NICA members are also reimbursed for Stelara® provided to patients under Part D and Part B.

13. Further, price negotiations with respect to Stelara® reimbursements under Part D will affect reimbursement rates for NICA members who are reimbursed for providing Stelara® under Part B. For example, a 130 mg vial of Stelara® (National Drug Code No. 57894-0054-27) is most commonly administered by providers and billed under Part B—but in some instances, it may be billed under Part D when acquired through a specialty pharmacy. The government's calculation of total gross expenditures for Stelara® under Part D for Initial Price Applicability Year (IPAY) 2026 includes this National Drug Code ("NDC"), and NICA expects that the Maximum Fair Price ("MFP") for Stelara® will likewise include and apply to this NDC. Since this NDC is also used to

4

DocuSign Envelope ID: C5B3EF24-9CDD-41EF-BB77-25E2D2DCAD5E

calculate the ASP for Stelara® dosages administered under Part B, the ASP for Stelara® under Part B will be impacted by price negotiations with respect to reimbursements for Stelara® under Part D. In short, a decrease in reimbursements rates for Stelara® under Part D will cause a decrease in reimbursement rates for Stelara® under Part B. The upshot is that NICA's members will be affected by impending price negotiations with respect to Stelara® regardless of whether they are reimbursed for Stelara® under Part D or Part B.

14.     NICA's members will suffer financial injury if drugs that they receive reimbursements for under Part B and Part D are subject to "negotiation" under the Drug Price Negotiation Program implemented by the Inflation Reduction Act.

15.     The Drug Price Negotiation Program was enacted to impose downward pressure on the price of certain drugs by subjecting them to "negotiation" and imposing a "Maximum Fair Price" for drugs selected for price negotiation. NICA members frequently provide pharmaceuticals and infusion services to patients covered by Medicare and receive reimbursements for those pharmaceuticals and services under Part D and Part B. NICA members will suffer financial injury if those reimbursements decrease because such decreases will affect the margins that NICA's members earn on those pharmaceuticals. For example, when NICA members provide drugs and biologics to Medicare patients under Part B, Medicare calculates the reimbursement paid to the provider as the ASP of the drug plus six percent. When HHS imposes a "Maximum Fair Price" for a drug that is lower than the ASP, the six percent margin paid to the provider decreases in absolute terms, and the provider is financially harmed as a result. Decreased reimbursement rates will also affect the market price that NICA's members are able to charge private payors for those same pharmaceuticals.

24-50180.564

16.     To take one example, one of the initial drugs designated for "negotiation" is Stelara. As noted, NICA's members provide and are reimbursed for Stelara® under both Part B and Part D. If reimbursement rates for Stelara® drop, then the margins that NICA members earn with respect to Stelara® will shrink in absolute terms, even if NICA members maintain the same margin percentage. If margins drop significantly, the NICA members may ultimately be forced to make formulary decisions regarding whether they will continue offering the drug to patients at all. The ultimate effect would be to decrease patient access to Stelara®.

17.     If Stelara® and other drugs provided by NICA and its members are subjected to "negotiation" under the scheme established by the Inflation Reduction Act, the consequences for NICA and its members will be significant. As noted above, Medicare beneficiaries make up a substantial proportion of the patients served by NICA's members, and under the existing drug price regime, NICA members generally break even or earn narrow margins when providing pharmaceuticals and services to Medicare patients. If reimbursement rates drop for pharmaceuticals provided to those patients under Part D or Part B, NICA members may be forced to stop seeing Medicare patients entirely. And if decreased reimbursement rates result in downward pressure on market prices for drugs selected for "negotiation," many NICA members will be in financial peril and may shut down entirely. The unintended consequence would be an exodus of Medicare and commercial-payor patients from infusion centers to hospitals—which provide infusion services and pharmaceuticals to patients at a significantly *higher* cost than infusion centers.

18.     NICA would also suffer injury if a manufacturer chooses to withdraw from Medicare or Medicaid rather than negotiate or agree to a "Maximum Fair Price," because in that circumstance, NICA would no longer be able to receive reimbursements for providing that

6

DocuSign Envelope ID: C5B3EF24-9CBD-41EF-BB77-25E2D2DCAD5E

manufacturer's drugs to Medicare patients. NICA's members would then suffer financial injury in the form of lost reimbursement revenues, while the patients served by NICA's members would lose access to those medications.

19.     It is a virtual certainty that HHS will continue to designate drugs for "negotiation" that are provided by NICA's members to Medicare patients and for which NICA receives reimbursements under Part B and Part D.

20.     The drug price "negotiation" scheme implemented by the Inflation Reduction Act is already impacting the ability of NICA's members to raise debt and equity funding for their operations. Because NICA's members subsist on narrow margins with substantial costs, the ability of NICA's members to raise capital on favorable terms is critically important to their financial solvency. But the terms on which NICA's members can raise debt and equity capital are directly impacted by their current economic prospects and projected margins, and the Drug Price Negotiation Program is already affecting (and will continue to affect) the economic prospects and cost margins of NICA's members. For example, some of NICA's members are currently courting private equity investments as a means of obtaining additional funding for their infusion centers and in-house pharmacies and are already being impacted by the Drug Price Negotiation Program because they are rely on reimbursements for Stelara® (and other drugs) under both Part D and Part B. As HHS continues to designate more and more drugs dispensed by NICA's members, these negative effects on NICA's members ability to raise debt and equity financing on favorable terms will continue to cause financial injury to NICA's members.

21.     NICA's members are in the business of extending and improving patients' lives by providing them with new and innovative drugs and biologics. However, providers administering these innovative treatments are only able to continue operating because they have built business

24-50180.566

operations around obtaining reimbursement for those treatments at market prices. Market-based reimbursement is the foundation of how providers serve the needs of their patients and keep their doors open. The "negotiation" scheme implemented by the Inflation Reduction Act threatens to upend this ecosystem by giving HHS unilateral authority to set drug prices while insulating those decisions from administrative and judicial review.

22.     In short, NICA's members fear that changes to payment and reimbursement for certain drugs under the Drug Price Negotiation Program will throw their financial stability into peril. And if NICA members stop providing drug and biologic therapies, patients nationwide will suffer from their inability to quickly, easily, and/or cheaply get the medications on which they rely to live their lives.

23.     I declare under penalty of perjury that the foregoing is true and correct.


Executed this 25th day of September, 2023.

*DocuSigned by:*

*Brian Nyquist*

0B99D3761108488...

Brian J. Nyquist

Dated:  April 12, 2024

*/s/ Michael Kolber*

Michael Kolber
MANATT, PHELPS &
   PHILLIPS LLP
7 Times Square
New York, NY 10036
(212) 790-4568
mkolber@manatt.com

Megan Thibert-Ind
MANATT, PHELPS &
   PHILLIPS LLP
151 N. Franklin St. Suite 2600
Chicago, IL 60606
(312) 477-4799
mthibert-ind@manatt.com

*Counsel for Appellant*
*Global Colon Cancer Association*

Respectfully submitted,

*/s/ Austin Krist*

Tim Cleveland
Austin Krist
Ibituroko-Emi Lawson
Gerard Bifulco
CLEVELAND KRIST LLC
303 Camp Craft Road, Suite 325
Austin, TX 78746
(512) 689-8698
akrist@clevelandkrist.com

*Counsel for Appellant*
*National Infusion Center*
*Association*

*/s/ John P. Elwood*

Jeffrey L. Handwerker
John P. Elwood
Allon Kedem
William Perdue
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.elwood@arnoldporter.com

*Counsel for Appellant*
*Pharmaceutical Research and*
*Manufacturers of America*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024 the foregoing document was electronically filed with the Court via the appellate CM/ECF system, and that copies were served on counsel of record by operation of the CM/ECF system on the same date.

Dated:  April 12, 2024

/s/ *John P. Elwood*
  John P. Elwood

*Counsel for Appellant*
*Pharmaceutical Research and*
*Manufacturers of America*